**MIDWEST RESEARCH INSTITUTE,**
**Plaintiff,**

v.

**UNITED STATES of America,**
**Defendant.**

**No. 78–0875–CV–W–6.**

United States District Court,
W.D. Missouri, W.D.

Feb. 2, 1983.

George E. Feldmiller, Charles W. German, Stinson, Mag & Fizzell, Kansas City, Mo., for plaintiff.

Glenn L. Archer, Jr., Asst. Atty. Gen., Angelo Castelli, Mary Frances Clark, Tax Div., Dept. of Justice, Washington, D.C., Robert G. Ulrich, U.S. Atty., Kansas City, Mo., for defendant.

## MEMORANDUM AND ORDER

SACHS, District Judge.

This case, filed in 1978 after some fifteen years of administrative proceedings, is a suit for a tax refund, to recover $461,958.02 in taxes assessed for the years 1962–1970 and paid under protest in 1977. Plaintiff Midwest Research Institute (MRI) is a private not-for-profit corporation that is organized and operated for "scientific . . . purposes" and thus enjoys a tax exemption pursuant to 26 U.S.C. § 501(c)(3). MRI's tax-exempt status is not challenged in this action. Defendant contends, however, that a portion of plaintiff's income earned during the years in question is taxable as "unrelated business income". 26 U.S.C. § 511.

The case was tried to the Court and thereafter extensively briefed. At this time we rule for the plaintiff, with minor exceptions noted below. The following opinion shall be considered as the Court's findings of fact and conclusions of law, entered pursuant to Rule 52(a), F.R.Civ.P.

## FACTS [1]

Midwest Research Institute was incorporated on December 10, 1943 (Pltf.Exh. 1) as a Missouri not-for-profit corporation. Its articles of agreement provided that the organization's purposes would be, in part:

(a) to promote pure and applied sciences,

(b) to improve and assist industry, agriculture and livestock production by the application of science,

(c) to conduct scientific investigations and industrial research for industry and agriculture,

(d) to foster the exchange of technical experience and research results among producers, manufacturers, agriculturists, and all others who may be benefited by the application of pure science,

(e) to assist manufacturers, farmers, and all others in the development of more efficient and scientific methods of production, [and]

(f) by the application of science and research, to advance the use of natural resources.

(Pltf.Exh. 1). A brochure prepared for use in the solicitation of funds for initial capital described the Institute as "a non-profit scientific research organization founded to develop agriculture, business, commerce, industry and the natural resources of the Midwest." (Pltf.Exh. 3). This brochure was submitted, along with other materials, in connection with MRI's application for tax-exempt status. On July 8, 1946, the Internal Revenue Service (IRS) determined that MRI qualified as a tax-exempt organization. (Pltf.Exh. 4). Plaintiff's property has also always been treated as tax-exempt under Missouri law, despite its widely understood major function of performing research projects, for a fee, for local industry

1. In addition to the statement of facts set forth herein, the Court adopts the stipulation of facts filed by the parties on June 14, 1982, and refers to other factual findings in connection with its legal analysis.

as part of its general mission of "developing resources" in the region. H. Haskell & R. Fowler, *City of the Future* 174–75 (1950).[2]

MRI conducts research projects for independent sponsors on a contract basis. Approximately 75% of the projects are performed for various governmental entities. (Tr. 101). The government work has been increasing. When MRI was first established a larger percentage of its activity was devoted to research for private sponsors. Some of the private sponsors are tax-exempt and/or non-profit organizations. MRI charges for its services by estimating the direct and indirect costs attributable to the project and adding a percentage factor. (Stip. of facts, ¶ 13). The project agreements provide that "[a]ll reports made by the Institute from the Project become the property of the Sponsor." (Def.Exh. 4). Research projects are generally assigned to one of five departments: physics, chemistry, economic development, engineering, and biological sciences. (Stip. of facts, ¶ 16). The criteria for selecting projects are designated in a document written in 1965 (Pltf.Exh. 49), which was a restatement of preexisting policy. (Tr. 217). These criteria include staff interest, the probability of utilization of the results, the degree of uniqueness, and the "potential contribution to the public welfare," among other factors.

During the years in issue in this lawsuit, the range of MRI's annual gross income was from approximately $3.9 million to $7 million. Net income as a percentage of gross income ranged from 1.1% to 6.8%, averaging 3.4% for the entire period. (Tr. 303).

This lawsuit concerns whether some 1,218 projects[3] performed by MRI from 1962 to 1970 are subject to taxation as unrelated business income. (Def.Exh. 78). Although no precise percentages were presented at trial, it would appear that these projects constitute nearly all of the projects done for non-governmental sponsors during the period in question. (Tr. 98–102, 359–62, 463–65).[4]

## GOVERNING LAW AND LEGISLATIVE HISTORY

Sections 511 through 513 of the Internal Revenue Code impose a tax on the "unrelated business taxable income" of corporations otherwise exempt from taxation pursuant to 26 U.S.C. § 501(c)(3). Under prior law, income was considered to be exempt from tax if its "destination" was a qualifying religious, charitable, scientific or educational institution, without regard to the business character of the activity that produced the income. *Willingham v. Home Oil Mill,* 181 F.2d 9 (5th Cir.1950); *Roche's Beach, Inc. v. Commissioner,* 96 F.2d 776 (2d Cir. 1938). The tax was enacted in response to the practice of some tax-exempt charitable and educational institutions of "engaging in a wide variety of business undertakings . . . clearly unrelated to their primary functions." Hearings Before the Committee on Ways and Means, 81st Cong., 2d Sess. 19 (1950) (statement of Secretary of the Treasury Snyder). The most notorious example of this practice was the operation of a spaghetti factory by New York University. *Clarence LaBelle Post No. 217, Veterans of Foreign Wars of the United States v. United States,* 580 F.2d 270, 272 (8th Cir.) *cert. dismissed* 439 U.S. 1040, 99 S.Ct. 712, 58 L.Ed.2d 716 (1978); 96 *Cong.Rec.* 9366

2. Under different state laws a similar (now defunct) organization in Minnesota has been ruled subject to local property taxes, *North Star Research Institute v. Hennepin County,* 306 Minn. 1, 236 N.W.2d 754 (1976).

3. The record contains references to over 1,500 projects in issue. This is due to the fact that some projects, which were performed over the course of more than one year, were assigned separate project numbers for each of the years over which performance took place. (Tr. 636). Forty-five of the projects originally challenged by defendant, listed in category 19 of defend-

ant's exhibit no. 78, were subsequently conceded by defendant to be non-taxable. (Tr. 637).

4. The projects in issue include 483 "regular" projects and 735 "account 5" projects. Account 5 projects are smaller projects, generally encompassing billings of less than $2,500 and a short duration. (Tr. 218). Income from account 5 projects ranged from $2,000 to $17,-000 or $19,000 during the years in question and ranged from .04% to .27% of revenue, averaging .17% of revenue. (Tr. 305–06). Revenue from account 5 projects represents 12% of the income in issue. (Def.Exh. 78).

(1950) (remarks of Rep. Lynch). *See C.F. Mueller Co. v. Commissioner,* 190 F.2d 120 (3d Cir.1951). The drafters of the legislation were concerned in part with the competitive advantage enjoyed by tax-exempt organizations in the conduct of business activities, H.R.Rep. No. 2319, 81st Cong., 2d Sess. 36–37 (1950); Hearings Before the Committee on Ways and Means, 81st Cong., 2d Sess. 19 (1950) (statement of Secretary of the Treasury Snyder), and considered this advantage to be inequitable and a danger to profit-making businesses when those activities were not related to the organization's exempt purpose. 96 *Cong.Rec.* 9364–65 (1950) (remarks of Reps. Simpson & Lynch); Hearings Before the Committee on Ways and Means, 81st Cong., 2d Sess. 4 (1950) (statement of President Truman).

The Code defines "unrelated business taxable income" as the taxable income from a trade or business that is "regularly carried on" by the 501(c)(3) organization, the conduct of which is "not substantially related" to the organization's performance of the function constituting the basis for its exemption under § 501. 26 U.S.C. §§ 512, 513. Because the unrelated-business-income sections refer back to the basis of an organization's exemption under § 501, the latter section, and the regulations promulgated thereunder, must be consulted to determine whether the allegedly taxable trade or business is substantially related to the organization's exempt functions. In the case of an organization exempt for scientific purposes,[5] 26 C.F.R. § 1.501(c)(3)–1(d)(5)(i) through (iii) provides:

(5) Scientific defined. (i) Since an organization may meet the requirements of section 501(c)(3) only if it serves a public rather than a private interest, a "scientific" organization must be organized and operated in the public interest (see subparagraph (1)(ii) of this paragraph). Therefore, the term "scientific", as used in section 501(c)(3), includes the carrying on of scientific research in the public interest. Research when taken alone is a

word with various meanings; it is not synonymous with "scientific"; and the nature of particular research depends upon the purpose which it serves. For research to be "scientific", within the meaning of section 501(c)(3), it must be carried on in furtherance of a "scientific" purpose. The determination as to whether research is "scientific" does not depend on whether such research is classified as "fundamental" or "basic" as contrasted with "applied" or "practical". On the other hand, for purposes of the exclusion from unrelated business taxable income provided by section 512(b)(9), it is necessary to determine whether the organization is operated primarily for purposes of carrying on "fundamental", as contrasted with "applied", research.

(ii) Scientific research does not include activities of a type ordinarily carried on as an incident to commercial or industrial operations, as for example, the ordinary testing or inspection of materials or products or the designing or construction of equipment, buildings, etc.

(iii) Scientific research will be regarded as carried on in the public interest—

(a) If the results of such research (including any patents, copyrights, processes, or formulae resulting from such research) are made available to the public on a nondiscriminatory basis;

(b) If such research is performed for the United States, or any of its agencies or instrumentalities, or for a State or political subdivision thereof; or

(c) If such research is directed toward benefiting the public. The following are examples of scientific research which will be considered as directed toward benefiting the public, and, therefore, which will be regarded as carried on in the public interest: (1) Scientific research carried on for the purpose of aiding in the scientific education of college or university students; (2) scientific research carried on for the

---

5. The determination letter sent to plaintiff in 1946 stated that plaintiff was considered exempt "for educational and scientific purposes." (Pltf.Exh. 4). The parties have addressed the issues in this case in terms of the exemption for scientific purposes. Consideration of the educational exemption would not appear to alter the outcome of the case in any respect.

purpose of obtaining scientific information, which is ·published in a treatise, thesis, trade publication, or in any other form that is available to the interested public; (3) scientific research carried on for the purpose of discovering a cure for a disease; or (4) scientific research carried on for the purpose of aiding a community or geographical area by attracting new industry to the community or area or by encouraging the development of, or retention of, an industry in the community or area. Scientific research described in this subdivision will be regarded as carried on in the public interest even though such research is performed pursuant to a contract or agreement under which the sponsor or sponsors of the research have the right to obtain ownership or control of any patents, copyrights, processes, or formulae resulting from such research.

Neither party has contended that the regulation is invalid.[6]

Plaintiff states that its exemption under § 501 is based on the fourth example contained in § 1.501(c)(3)–1(d)(5)(iii)(c), which concerns scientific research carried on to encourage industry in a particular geographic area. With this example in mind, the determination whether plaintiff has earned taxable income may be broken down into the following elements:

Plaintiff has earned taxable income if it has:

(1) operated a trade or business
(2) that is regularly carried on
(3) and which is not substantially related
(4) to the performance of scientific research

(5) carried on for the purpose of attracting, retaining, or encouraging the development of industry in a community or area.

Viewing the elements in this manner and in conjunction with the regulation provisions set forth above, it is evident that several issues discussed at trial are not directly relevant to resolution of the case. The first of these is the question whether and to what extent plaintiff was required to publish the results of its research to qualify for nontaxable treatment. Research that is published is listed as an alternate example of scientific research carried on in the public interest. 26 C.F.R. § 1.501(c)(3)–1(d)(5)(iii)(c)(2). If publication of scientific research carried on for purposes of encouraging industry were required, the entire encouragement of industry provision would be superfluous, a result not likely intended by its drafters.

The question whether research conducted by plaintiff was "fundamental" or "applied" is not relevant in the context of this case. This proposition is set forth in the regulation. 26 C.F.R. § 1.501(c)(3)–1(d)(5)(i). While the fundamental/applied distinction is relevant to a broader exemption from taxation provided by 26 U.S.C. § 512(b)(9), plaintiff does not rely on that section.

Also not directly relevant is the line of questioning pursued at trial concerning whether sponsors could have obtained the research services provided by plaintiff from non-exempt organizations. Defendant attempted to portray plaintiff's activities as "unfair competition" through this evidence.[7] Tax-exempt organizations do enjoy a competitive advantage when providing

---

**6.** Treasury regulations are valid unless unreasonable and inconsistent with the statute, *Commissioner v. Portland Cement Co.,* 450 U.S. 156, 169, 101 S.Ct. 1037, 1045, 67 L.Ed.2d 140 (1981); *Clarence LaBelle Post No. 217, supra,* at 275 n. 1 (Lay, J., concurring). The Court has some concern that certain portions of the regulations, if given too expansive a reading, would render those portions inconsistent with the statute. This question is dealt with in connection with the discussion of "ordinary testing," *infra.*

**7.** Plaintiff responded effectively that the fears of the late 1940's were unwarranted, or were scotched by the statutory amendment. There is no evidentiary hint that MRI is frequently perceived as a threat to free enterprise in the area. On the contrary, to the extent reputation is relevant, MRI has an institutional prestige which is unsurpassed in the Kansas City region, as evidenced by its ability to attract the time and talents of the area's civic leaders as trustees.

the same goods and services as ordinary businesses, *"The Macaroni Monopoly: The Developing Concept of Unrelated Business Income of Exempt Organizations, 81 Harv. L.Rev.* 1280, 1281–82 (1968), and, as discussed above, Congress was concerned with unfair competition when it enacted the unrelated-business tax. Nonetheless, the drafters chose to tax only income from businesses that were not "substantially related" to the exempt purpose of the organization, not all income from activities that competed with private industry. 26 U.S.C. § 513. Defendant's Trial Brief at 8; *Macaroni Monopoly, supra,* at 1282, 1284–85. Thus, "the critical question under the statute is not the question of unfair competition, but whether the activity constitutes an unrelated 'trade or business.'" *Clarence LaBelle Post No. 217, supra,* at 275 (Lay, J., concurring). Since the activities here asserted to be taxable constituted the central function of MRI at the time it was granted tax-exempt status by the Secretary, and since that status is not questioned, the statutory requirement of unrelatedness would doubtless be dispositive of the government's claim, except for the regulatory maze through which we now travel.

### DEFINITION OF THE TRADE OR BUSINESS

One of the more elusive determinations to be made in analyzing this lawsuit is the scope of the allegedly unrelated trade or business. 26 C.F.R. § 1.513–1(b) provides that the term "trade or business" "generally includes any activity carried on for the production of income from the sale of goods or performance of services." Such activity may be considered a trade or business even though it is "carried on within a larger aggregate of similar activities or within a larger complex of other endeavors which may, or may not, be related to the exempt purposes of the organization." *Id.* De-

fendant appeared to rely on two different definitions of the appropriate trade or business under consideration. The first of these is the proposition that each research project must be examined as a separate trade or business. Defendant's Post-Trial Brief at 10–11.[8] The second definition suggested is that the trade or business in issue consists of the sum total of all research projects conducted for private sponsors. Defendant's Trial Brief at 10; Defendant's Proposed Findings of Fact No. 9; Defendant's Post-Trial Brief at 1, 10–11. This definition is consistent with the fact that the projects in issue apparently constitute virtually all of the projects conducted for private sponsors during the years in question.

■ Treatment of each research project as a trade or business is not uniformly appropriate. To constitute an unrelated trade or business for purposes of the Code, an activity must have been "regularly carried on." 26 U.S.C. § 512. Activities will ordinarily be considered to be regularly carried on "if they manifest a frequency and continuity, and are pursued in a manner, generally similar to comparable commercial activities of nonexempt organizations." 26 C.F.R. § 1.513–1(c)(1). This description cannot be applied to all the individual projects. Each project was a discrete activity taking place over a discrete period of time, not a continuing, repetitive operation. *Compare Smith-Dodd Businessman's Ass'n, Inc. v. Commissioner,* 65 T.C. 620, 624 (1976) (bingo games held on weekly basis). For example, when plaintiff developed a process of restoring the pile on material used for stuffed toys (Project No. 2759–E, Pltf.Exh. 31), it could not be considered to be in the toy manufacturing business. Individual projects do not possess the continuity necessary to be comparable to a commercial venture conducted by a nonexempt organization.

---

8. Cornelius J. Sullivan, the revenue agent belatedly assigned to this case through the administrative appeal process, after the death of the original agent, denied that the IRS considered each project a separate trade or business (Tr. 690–91), but also testified that income determined to be taxable in the administrative process was arrived at by examining each project.

(Tr. 688). Sullivan's conception of the trade or business in issue appeared to be research projects conducted for private sponsors that were not in the "public interest." (Tr. 691). This definition begs the ultimate question in the case, however, and continues to focus on a project-by-project approach for a determination of what is in the public interest.

Designation of all research projects conducted for private sponsors as the trade or business in issue satisfies the regularly-carried-on requirement of § 512. As mentioned previously, this designation is consistent with the defendant's taxation of nearly all such projects. The main thrust of defendant's case appeared to be that projects conducted for private sponsors inherently produced a private benefit to the sponsor that outweighed the public benefit accruing from the project and therefore could not be considered to have been conducted in the public interest.[9] (Tr. 463–64).

■ The two categories discussed above are not the only alternatives in designating the appropriate trade or business. Plaintiff conducted some types of projects, such as bank feasibility studies,[10] a number of times on a continuing basis, so as to satisfy the "regularly carried on" requirement of § 512. These groups of similar, regularly conducted projects may be regarded, in our view, as trades or businesses for purposes of the unrelated-business tax. Therefore, we proceed to examine the remaining elements primarily with regard to the private-sponsor projects considered as a whole, but also with regard to groups of projects that may be treated as separate trades or businesses when appropriate.

Treatment of the case in this manner does not imply that no regard should be given to individual projects. The projects must be examined to determine whether the total satisfies the requirements of the statute. Variance of individual projects from the criteria for determining whether an activity is tax-exempt scientific research does not necessarily dictate, however, that the private-sponsor projects taken as a whole (or relevant subsets thereof consisting of similar regularly conducted projects) are not substantially related to plaintiff's exempt purpose.

## SCIENTIFIC RESEARCH IN THE PUBLIC INTEREST

■ Following the elements we set forth above, the question currently to be considered may be phrased as whether plaintiff's performance of projects for private sponsors was substantially related to the performance of scientific research carried on for the purpose of encouraging industry in a particular geographic area. The answer to this question, discussed more fully below, is that plaintiff's private sponsor projects *were*, with exceptions to be noted, scientific research carried on for the required purpose. It is axiomatic from the reference in 26 C.F.R. § 1–501(c)(3)–1(d)(5)(iii)(c)(4) to sponsors and that section's juxtaposition with § (d)(5)(iii)(b), involving research conducted for governmental entities, that § (d)(5)(iii)(c) contemplates that receipts from research conducted for private sponsors may qualify for tax-exempt treatment. The two principal remaining questions are whether the activity in issue was scientific research and whether it meets the regulatory (nonstatutory) requirement of being conducted for the purpose of encouraging industry in a particular area.

## SCIENTIFIC RESEARCH

■ The regulations offer no precise definition of "scientific" for purposes of § 501,

---

**9.** Defendant did acknowledge that some projects would be tax-exempt despite their having been conducted for private sponsors if the results of the research were published *or* if the public benefit "outweighed" the private benefit, such as research conducted to discover the cure for a disease. (Tr. 671–72). But defendant tacitly conceded the unworkable, subjective aspect of the "public interest" test when counsel indicated, for example, that enhancement of the tobacco crop in the Weston, Missouri, area might also be in the public interest.

**10.** A large number of bank feasibility studies were performed during a particular period of time (Tr. 437), qualifying this activity as a separate trade or business. The projects constituted scientific research conducted for purposes of encouraging industry in the area, however, and are therefore not taxable. The purpose of the studies was to determine the economic needs of an area for opening of bank branches in the area. The studies were conducted in connection with branch applications and involved scientific techniques employed by economists and mathematicians. (Tr. 384–86). The "dismal science" is indeed an aspect of science, albeit with a different laboratory than other sciences. (Tr. 369–70).

providing only that scientific research may be either "fundamental" or "applied" but may not be "of a type ordinarily carried on as an incident to commercial or industrial operations, as, for example, the ordinary testing or inspection of materials or products or the designing or construction of equipment, buildings, etc." 26 C.F.R. § 1.501(c)(3)–1(d)(5)(ii). Webster's Third New International Dictionary refers to science as "a branch of study that is concerned with observation and classification of facts and especially with the establishment ... of verifiable general laws chiefly by induction and hypotheses." In the Court's view, while projects may vary in terms of degree of sophistication, if professional skill is involved in the design and supervision of a project intended to solve a problem through a search for a demonstrable truth, the project would appear to be scientific research. A somewhat less expansive view will be used in this case, however, in light of the regulations, which are assumed to be valid.

The "incident to commercial or industrial operations" provision of § (d)(5)(ii) is an odd and troublesome section. If read literally, the section describes work that would certainly be generally understood to be scientific, and might conflict with the statute. The section could be interpreted as setting forth a type of scientific research not regarded as being in the public interest, but the section is ill-placed in the regulation to reflect such an interpretation. Furthermore, an expansive reading of the first clause of the section would appear to contradict the following section's endorsement of tax-exempt treatment of the proceeds of research conducted for the purpose of encouraging industry. No examples have been offered of research designed to develop industry that could not conceivably be conducted by a particular research and development department of a large business or industrial enterprise.[11]

The testing reference in § (d)(5)(ii) may be given workable application by ruling, consistent with the testimony and other evidence offered (see generally Pltf.Exh. 121, 127), that the section was adopted to satisfy in part the concerns of commercial testing laboratories, which feared the consequences of tax-exempt status for scientific research institutes such as plaintiff. Accordingly, the section may be interpreted to apply to the type of "ordinary or routine testing" performed by such laboratories. This work was described as generally repetitive work done by scientifically unsophisticated employees for the purpose of determining whether the item tested met certain specifications, as distinguished from testing done to validate a scientific hypothesis. (Tr. 86–87). The witnesses appeared to understand the distinction, and testified credibly that MRI avoided routine testing projects.[12]

With respect to "design," we are guided by the reference in the legislative history to research as including "experimental construction and production". H.R.Rep. No. 2319, 81st Cong., 1st Sess. 37 (1950). Similarly, the regulations promulgated in a slightly different context (pursuant to 26 U.S.C. § 174 regarding the deductibility of research and development expenditures) distinguish between "the development of an experimental or pilot model" and nondeductible ordinary expenditures. 26 C.F.R. § 1.174–2(a)(1). We interpret the "designing or construction" language, in light of these provisions, to leave exempt the development of prototypes and models. An example of a project challenged by defendant as "ordinary design" that involved the development of a prototype was Project No. 2775–E, undertaken to design equipment for de-panning buns. As with the interpre-

11. MRI does appear to do work that an R & D department of a "Fortune 500" industry might do in-house. Such industries being in short supply in the Kansas City area, the local choice appears to be between scientific impoverishment or an organization like MRI. This may well explain the public policy appeal of the area development portion of the regulation. See note 19, infra.

12. Unless the "ordinary testing" proviso is given an interpretation limiting its application in this manner, serious questions are raised regarding the validity of this portion of the regulation, given its apparent inconsistency with the statute and the legislative history.

tation of "ordinary testing", the relevant regulatory distinction between exempt and non-exempt activities is according to degree of sophistication.

The evidence relating to the scientific nature of plaintiff's activities consisted primarily of the testimony of five scientists employed by plaintiff who testified from personal knowledge and review of records, including summaries, relating to the projects in issue. These witnesses testified that, with some sixty exceptions, the work was scientific. Defendant's Reply Brief of October 7, 1982, refers to and does not challenge these statements. Defendant has challenged some few projects in issue as not constituting scientific research, although defendant's primary argument has been that the projects, although scientific, are commercially motivated and therefore not in the public interest.[13]

The "Lubrication of parts" category listed in plaintiff's exhibit 78 is one example of a group of projects challenged as not being scientific research. It also constitutes a series of similar projects that may be regarded as a separate trade or business for purposes of the unrelated-business tax.[14] The evidence presented at trial established that these projects arose from a venture of significant complexity. Because petroleum-based lubricants evaporate above certain temperatures, plaintiff developed a solid compound for use as a lubricant in the national space program. (Tr. 103). This work was done for government sponsors (Tr. 104) and is, therefore, apparently not in issue. After the development of the lubricant, plaintiff serviced, on a contract basis, materials provided by companies needing the solid lubricant. (Tr. 104, 306). Dr. Charles Kimball, the president of MRI from 1950 to 1975, testified that the lubrication

service was provided as an "accommodation service." (Tr. 104).

It cannot be doubted that the development of the solid lubricating material, which is not in issue, was an example of scientific research. The material's development must be distinguished from the later providing of the lubricating service, however. At the time that plaintiff lubricated materials for companies needing the solid lubricant, plaintiff was no longer engaged in research for the sponsor. Sponsors were not compensating plaintiff for the results of research, but for applying the material, for a service that simply had its origin in scientific research performed at an earlier stage. Had plaintiff discovered the proper solid lubrication formula in a research project for a private sponsor who subsequently marketed the material, the fee for the initial development of the material would be exempt income to plaintiff and the proceeds from the subsequent marketing or servicing of the product would be taxable income to the sponsor. This result should not change because plaintiff chose to market the material itself.

In making this research/marketing distinction with respect to the lubrication work viewed as a separate trade or business, it must be remembered that the "substantially related" provision of § 513 prevents taxation of the income of a separate trade if the conduct of the trade is substantially related to the performance of the organization's exempt functions. This requirement is satisfied if the conduct of the business "has [a substantial] causal relationship to the achievement of exempt purposes" 26 C.F.R. § 1.513–1(d)(2), that is, if "the production or distribution of the goods or the performance of the services from

---

**13.** Agent Sullivan testified that the projects listed in categories 3–5 of defendant's exhibit 78 (lubrication, computer use, and part manufacture/printing/other services) were the only projects in issue he considered clearly unscientific (Tr. 680).

**14.** Plaintiff objected to defendant's exhibit 78, claiming that it was not a meaningful categorization since it was prepared by a non-scientist. We do not decide whether the exhibit

makes distinctions that are meaningful in a scientific sense. In fact, not all of the categories appear to be logically designated (two of the categories are "testing" and "other testing"). Nevertheless, while the government's categories are not controlling, they may be helpful in determining whether and which groups of activities may be considered regularly carried on so as to constitute separate trades or businesses.

which the gross income is derived ... contribute[s] importantly to the accomplishment" of the exempt purposes. *Id.* We do not believe this can be said of the lubrication service in this case. The situation may be contrasted with *Edward Orton, Jr. Ceramic Foundation v. Commissioner,* 56 T.C. 147 (1971). In that case, the court relied on the fact that the taxpayer manufactured and sold pyrometric cones in order to facilitate further developments in the improvement of ceramics. *Id.* at 163–64. *See also St. Luke's Hospital v. United States,* 494 F.Supp. 85, 90 (W.D.Mo.1980) (results of outside pathology tests used in teaching). No evidence was offered to indicate that the lubrication service here in issue led to additional developments in the improvement of the lubrication material or produced benefits to other research conducted by plaintiff.

The computer use projects in issue stand on a similar footing with the lubrication service. Plaintiff, during the years in question, had an IBM 360 computer. In addition to using the computer in connection with its own research projects, plaintiff allowed other companies, on a continuing basis, to use the computer for their own purposes. (Tr. 102–103, 147). The fees from these rentals were recorded as Account 5 projects. Essentially, plaintiff was simply renting time on its computer, an activity that cannot be considered scientific research.[15] No evidence was offered that the computer rental contributed to the performance of other research so as to be substantially related to plaintiff's exempt purpose. Thus, the computer rental activity should be regarded as an unrelated business, the income from which is subject to taxation.[16]

The third category alleged by Agent Sullivan to consist of activities other than scientific research, *see* n. 7, *supra,* was category 4 of defendant's exhibit 78, entitled "part manufacture; printing; other services." The only projects within this category specifically described were project no. 5–542–B, a project in which plaintiff agreed to act as a straw purchaser of alginate compounds for a sponsor wishing to keep secret its interest in the materials (Def.Exh. 10), and project no. 5–424–B, entitled "photo-micrographs of six products." (Def.Exh. 11). Plaintiff has conceded that the former project was not scientific research, and the Court agrees.[17] The status of the photo-micrograph project is uncertain. With respect to the other projects included in this category, the only evidence before the Court is the testimony of MRI's scientists that all but three of the projects were scientific in nature and the testimony of Sullivan that the projects were not scientific. While the evidence is thin on both sides and all witnesses were associated with the parties, the preponderance would be with the scientific personnel rather than with the lay revenue agent. Even if the projects in this category were assumed to be non-scientific, the category title belies the notion that the projects represent any single *continuing* activity constituting a separate business.

Defendant maintains that a number of projects constituted "ordinary testing ... or designing, or construction of equipment", which is not regarded by the regulations to be scientific. We have stated our interpretation of this language above.

---

**15.** A number of these projects were conceded by plaintiff's witnesses to be non-scientific. (Pltf.Exh. 31).

**16.** Plaintiff relies on *Greene County Medical Society Foundation v. United States,* 345 F.Supp. 900 (W.D.Mo.1972) (the "Singing Doctors" case) in arguing that the computer rental services should not be taxed because they "are not provided for the purpose of making a profit." Plaintiff's Trial Brief at 72, n. 47. This is an overexpansive interpretation of the holding of *Greene County.* That case simply relied on the exception to the unrelated-business tax for activities "in which substantially all the work

in carrying on such trade or business is performed for the organization without compensation." 26 U.S.C. § 513(a)(1). There has been no contention that this exception is applicable to this case.

**17.** This project was clearly commercial, without any research component. If this type of activity had been conducted on a continuing basis it would certainly be taxable. The legislative history and regulations relating to the unrelated-business tax indicate that "sporadic" or "intermittent" activities do not trigger taxation, however. H.R.Rep. No. 2319, 81st Cong., 2d Sess. 109 (1950); 26 C.F.R. § 1.513–1(c).

Plaintiff has conceded that some of the activities challenged as ordinary testing are not scientific. With respect to projects that plaintiff's witnesses testified were scientific as distinguished from ordinary testing or design, contradictory evidence was provided regarding relatively few projects and has persuaded the Court that the only projects in question that were nonscientific were "projects" that were actually presentations to various businesses and organizations rather than research, (Tr. 377–79, 440–41), a few projects that appear to be ordinary testing within the guidelines set forth above, (Def.Exh. 14, 22), and a project to train employees of Allied Chemical to conduct taste tests. (Tr. 535–36). The presentations may be considered substantially related to plaintiff's exempt purposes, in that they attempted to educate organizations regarding the results of certain MRI projects or procedures used at MRI that could be transferred to the private sector. The other projects, even when considered in conjunction with the projects plaintiff concedes to be unscientific, are not significant enough in scope to rebut the evidence that plaintiff's private sponsor research projects other than lubrication and computer services, taken as a whole, are scientific.[18]

## ENCOURAGEMENT OF INDUSTRIAL DEVELOPMENT

The remaining substantive issue for decision is whether the private-sponsor research performed by plaintiff was done for the purpose of encouraging industry within a particular area, specifically, the Midwest. The evidence established that the private-sponsor research was performed for this purpose. Plaintiff's original articles of agreement and solicitation materials designated this as plaintiff's purpose. (Pltf.Exh. 1, 3). Dr. Kimball, John McKelvey, who is the current president of plaintiff and was formerly head of plaintiff's economic division, and several of plaintiff's trustees testified convincingly that it was plaintiff's primary purpose to attract and develop industry in what was, at the time of plaintiff's founding, a technology-poor region. These witnesses further testified that plaintiff was serving that purpose. (Tr. 44–45, 69–70, 252, 284–86, 365, 368). McKelvey testified that his first project at MRI was directed toward determining how plaintiff might better fulfill its purpose of transferring the benefits of research to the public. (Tr. 365).

Defendant has argued that broad public benefit to industry is outweighed by private benefit to an individual sponsor in most projects conducted for private sponsors and has proposed that research must meet the following requirements in order to qualify for tax-exempt treatment:

1. the particular research benefits an area as a whole and does not merely benefit one business in the area, perhaps at the expense of another;

2. the results of the particular research are generally available to all affected businesses in the area;

3. the research is primarily useful only in a specific geographic area.

Defendant's Trial Brief at 22. Nothing in the regulation indicates that public and private benefit must be weighed in some manner. The regulation makes the determination that research conducted for the purpose of attracting and developing industry constitutes a public benefit in itself.

Defendant cites three revenue rulings in support of its first proposed requirement. While revenue rulings are entitled to some weight, *Carle Foundation v. United States,* 611 F.2d 1192, 1195 (7th Cir.), *cert. denied* 449 U.S. 824, 101 S.Ct. 85, 66 L.Ed.2d 27 (1980), and one of the rulings tends to support defendant's position, revenue rulings

---

**18.** Defendant argues that even though projects may have been scientific in nature, the projects were not performed for a scientific purpose, as required by the regulations, but for business purposes. The Court was persuaded that plaintiff was motivated by a scientific and public purpose, even though such was generally not the primary motivation of a project's sponsor. (Tr. 46–47, 166–67, 172–73). The Court questions, however, whether the regulation requires a detailed examination of plaintiff's motivation. *See Est of Hawaii v. Commissioner,* 71 T.C. 1067, 1082 (1979) ("[I]t is petitioner's activities and not its members' devotion to their work that determines whether it is entitled to exemption from taxation.")

74–587 and 76–419 lend support to plaintiff's position that an activity may be exempt as benefitting the public even though it produces direct benefits to individual businesses. The organizations deemed exempt by the Secretary in those rulings provided capital or property at favorable rental rates to individual enterprises. As revenue ruling 74–587 recognized, "[t]he recipients of loans and working capital [who do not themselves qualify for charitable assistance] are merely the instruments by which the charitable purposes are sought to be accomplished." The same may be said of the private sponsors of plaintiff's projects in this case.

The Court was persuaded by the testimony of plaintiff's witnesses that the public is benefitted and economic growth in an area is developed not through publication but through the application of the research results through an intermediary, i.e., a private sponsor. (Tr. 46–47, 120–21, 131–32, 150, 368–69, 565–66). This fact and the separate publication provision in the regulation, 26 C.F.R. § 1.501(c)(3)–1(d)(5)(iii)(c)(3), rebut the notion behind defendant's second suggestion that the results of research must be generally available to benefit the public.

Defendant's third suggestion, relating to the geographic application of research, takes an unnecessarily narrow view of the scope of permissible research for purposes of § 501 (it is difficult to conceive of any piece of knowledge that would be "primarily useful" to individuals in one isolated area and not elsewhere (Tr. 132–133)). The suggestion does emphasize a significant (but perhaps questionable) limitation contained in the regulation: research must be conducted for purposes of benefitting industry in a particular area. Plaintiff's stated goal upon its incorporation was to serve the Midwest, with special emphasis on Missouri and the states bordering it to the north, west and south, otherwise identified somewhat quaintly as states containing schools in the Big Six athletic conference. (Pltf.Exh. 3,

Tr. 39–40). In ensuing years, the organization's concept of the Midwest has broadened and projects have been performed for sponsors in a number of other states. Plaintiff presented evidence that different government agencies and other individuals have used varying boundaries to define the region in which plaintiff is located. (Pltf. Exh. 44, 97–103; J. Garreau, *The Nine Nations of North America* (1981)).

In the Court's view it is not necessary to provide a precise definition of the Midwest to ensure that plaintiff's projects are designed to benefit the region. For purposes of determining that plaintiff's private-sponsor research, taken as a whole, is substantially related to its exempt purpose, we believe that it is sufficient to note the following figures and observations: (1) 66.9% of the regular projects in issue whose sponsor locations were identifiable were performed for sponsors in the six-state region in which plaintiff initially stated its emphasis would be placed (Def.Exh. 2); (2) 65.7% of the Account 5 projects, representing 76.8% of income from Account 5 projects, were performed for sponsors in the six-state region (Pltf.Exh. 142); (3) 82.2% of the regular projects were performed for sponsors in states included in the Breadbasket, the region described in *Nine Nations, supra,* as having Kansas City as its "capital." (Def.Exh. 2; *Nine Nations, supra,* 328–61); [19] (4) sponsor location does not delimit benefit to the area. A sponsor may have headquarters in a location outside the area and yet maintain a substantial presence in the area through which benefit is brought to the area (Tr. 316–17). Trans World Airlines, Kansas City's largest private employer, was cited as an example of this phenomenon (Tr. 76). In addition, projects performed outside the area may help to attract industry to the area (Tr. 249–50, 409–10). Plaintiff established that its private-sponsor research projects, taken as a whole, were predominantly performed

---

19. A reviewing court may be surprised by the linkage between Kansas City and the Northern Plains States. For present purposes, it may suffice to refer to the observation of witness Morton Sosland to the effect that Minneapolis, with its many large industries capable of doing research in-house, was not as able to support an organization like MRI, offering independent research facilities. Sosland Dep., at 56–57.

for the purpose of attracting, encouraging, and developing industry in the area in which plaintiff is located.

## SUMMARY

This controversy, now more than twenty years old, has spawned extensive effort and argument by the parties. Stripped to essentials, the question presented by the case is whether scientific research performed by an independent non-profit organization for private sponsors qualifies as a tax-exempt activity. The answer to this question is yes, at least when the research is performed for the purpose of aiding industrial development in a particular geographic area. Defendant has contended that such private-sponsor research must meet additional criteria establishing that it is in the public interest. The answer to this contention is contained in the statute and its supplementing restrictive regulations, promulgated by the Secretary, which dictate that research conducted to encourage industrial development is treated as being in the public interest. The Secretary is bound by the regulations, *Lansons, Inc. v. Commissioner*, 622 F.2d 774, 776 (5th Cir.1980), which are normally deemed to have received implicit Congressional approval.[20] *United States v. Correll*, 389 U.S. 299, 305–06, 88 S.Ct. 445, 448–49, 19 L.Ed.2d 537 (1967) (quoting *Helvering v. Winmill*, 305 U.S. 79, 83, 59 S.Ct. 45, 46–47, 83 L.Ed. 52 (1938)).

In this time of concern over making ends meet in the federal budget, defendant raises a material policy question whether a tax "loophole" should subsidize activities such as those in issue in this case. Persuasive arguments can be made both for and against an exemption as provided by the current regulation and statute. The proper forums for this controversy, however, are in Congress and the rulemaking procedures of the Secretary, not in the courts.

## ATTORNEYS' FEES

■ Plaintiff seeks to recover attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412. That section provides, in part, that fees shall be awarded in actions against the United States "unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A). An award of fees is not justified simply by the government's loss of a case or even by the decision to litigate not being based on a substantial probability of prevailing. H.Rep. No. 96–1418 at 11, *reprinted in* [1980] *U.S.Code, Cong. & Admin.News* at 4953, 4990. The test is "essentially one of reasonableness." *Id.* at 10, [1980] *U.S.Code, Cong. & Admin.News* at 4989.

■ An award of fees is not warranted in this case. Both parties represented to the Court that this was a difficult case of first impression, in which both private research institutes and the government were seeking judicial interpretation of the proper tax treatment of the activity in question. Plaintiff's extensive efforts in preparing the case were not indicative of litigation in which the government's opposition was not substantially justified. The Court was ultimately persuaded that a few of plaintiff's challenged activities were taxable and that defendant's arguments with respect to the remainder of the activities in question, while persuasive to some degree, were more

**20.** The regulation in question was adopted on January 11, 1961. T.D. 6525, 26 FR 189. There have been several amendments to the statute in the intervening years, *see* 26 U.S.C.A. § 501(c)(3) and annotations thereto, and two amendments to the regulations, T.D. 6939, 32 FR 17661, Dec. 12, 1967; T.D. 7428, 41 FR 34,620, Aug. 16, 1976, but no abrogation or modification of 26 C.F.R. § 1.501(c)(3)–1(d)(5)(iii)(c)(4). On the other hand, the regulation has not been the center of any controversy that would likely have been called to the attention of Congress. As Justice Frankfurter observed in *Scripps-Howard Radio, Inc. v. Fed-*

*eral Communications Comm'n*, 316 U.S. 4, 11, 62 S.Ct. 875, 880, 86 L.Ed. 1229 (1942), "the search for significance in the silence of Congress is too often the pursuit of a mirage." The Court notes, moreover, Judge Lay's reservation about regulations, expressed in *Clarence La-Belle Post No. 217, supra*, at 275 n. 1. Self-serving use of taxing regulations, contrary to the will of Congress, is a temptation the Secretary must resist; if not, the courts have an inescapable role in maintaining some principled consistency between congressional intent and administrative regulations.

properly within the purview of Congress than of this Court. Moreover, the legislative history of the Equal Access to Justice Act indicates that the "special circumstances" language of the statute is designed, at least in part, "to insure that the Government is not deterred from advancing in good faith the novel but credible extensions and interpretations of the law that often underlie vigorous enforcement efforts." H.Rep. No. 96–1418 at 11, [1980] *U.S.Code, Cong. & Admin.News* at 4990. This case involved a novel issue meeting these guidelines. Plaintiff's request for attorneys' fees will be denied. SO ORDERED.

## COMPUTATION OF REFUND

The parties have agreed to meet to compute the amount of the refund to which plaintiff is entitled according to the guidelines set forth in this opinion. According to our analysis of the evidence presented, plaintiff is entitled to a refund with respect to the taxes on all projects except for those involving lubrication services or computer rental.

The Court notes that this was a case having the potential for prolonged and meticulously detailed presentation of proof, which the parties simplified through generalized presentation of the evidence relating to most of the projects in issue. For the most part, this procedure was helpful to the Court. It is possible, however, that some minor factual errors have occurred in classification, particularly as to what nonscientific activities may be considered separate

trades or businesses.[21] The Court welcomes the opportunity to correct and revise its findings upon motion prior to the computation of the refund. In the alternative, the parties may be able to agree upon the appropriate treatment to be accorded various projects or groups of projects consistent with this ruling, and without prejudice to an appeal, without further contested motions in this Court. It is hereby

ORDERED that judgment be entered in favor of plaintiff this date, the amount of said judgment to be determined upon further filings by the parties.

ORDERED that, within twenty days from the date of this order, the parties submit any desired post-trial motions concerning modification of this memorandum and order with respect to factual determinations relating to the classification of specified projects in issue.

ORDERED that within forty days from the date of this order, or within twenty days from the date on which an order is issued ruling post-trial motions, whichever is later, the parties submit a stipulation of the appropriate amount of judgment to be entered in favor of plaintiff.

ORDERED that plaintiff's motion for partial summary judgment is denied as moot.

---

**21.** The "intermittent activities" exception of 26 C.F.R. § 1.513–1(c) may well have been too generously applied, as it relates to category 4 projects, for example.