UNITED STATES of America, Plaintiff,

v.

CANNONS ENGINEERING CORP., et al., Defendants.

COMMONWEALTH OF MASSACHUSETTS, Plaintiff,

v.

CANNONS ENGINEERING CORP., et al., Defendants.

STATE OF NEW HAMPSHIRE, Plaintiff,

v.

CANNONS ENGINEERING CORP., et al., Defendants.

Civ. A. Nos. 88–1786–WF to 88–1788–WF.

United States District Court, D. Massachusetts.

Aug. 14, 1989.

M. Ellen Carpenter, Asst. U.S. Atty., Boston, Mass., David Hird, Washington, D.C., for U.S.

Mark O'Connor, Rich, May, Bilodeau & Flaherty, P.C., Boston, Mass., Waldehig, Starr, Peters, Dunn & Chiesa, Charles Dunn, Manchester, Mass., for Kingston Warren Corp.

Kevin F. Moloney, Barron & Stadfeld, Boston, Mass., for J. Robert Cannon.

Jerry Schwartz, Environmental Enforcement Sec., Land & Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for Land & Natural Resources Div.

Thomas R. Rousell, Wilmington, Mass., for Edward C. Whitney & Son, Inc. # 23.

Mark L. Cook, Westminster, Mass.

Mark S. Granger, Morrison, Mahoney & Miller, Boston, Mass., for Giusti Baking Co. of New Bedford.

Charles F. Clinton, Manchester, N.H., for Frederick L. Tinkham, Frederick S. Tinkham, Tinkham Realty, et al.

Deming E. Sherman, Edwards & Angell, Providence, R.I., for INCO United States, Inc.

Richard Zolo, d/b/a Zollo Drum Co., Saint Lucia, Fla., pro se.

Michael A. Brown, Schmeltzer, Aptaker & Sheppard, P.C., Washington, D.C., Thomas Arnold, Arnold & Kangas, P.C., Concord, Mass., for Salt Water Trust.

Paul G. Garrity, Boston, Mass., for Roy Brothers, Inc.

Paul S. Samson, Riemer & Braunstein, Boston, Mass., for Crown Roll Leaf, Inc.

Michael DeFanti, Hinckley, Allen, Snyder & Comen, Providence, R.I., for Olin–Hunt Specialty Products Inc.

Mitchell Lyons, Levitz, Lyons, Kesselman, Modiste, Levy & Goodman, Stoughton, Mass., for W.E.S. Inc. d/b/a Maine Coastal Services.

Craig Campbell, Mark Furey, Thompson, McNaboe, Ashley & Bull, Portland, Me., Martha Koster, Gaston & Snow, Boston, Mass., for Raymark Ind.

Robert C. Barber, Looney & Grossman, Boston, Mass., for Cyn Oil Corp.

Laurie Burt, Robert S. Sanoff, Foley, Hoag & Eliot, Boston, Mass., for Cannons Sites Group.

William R. Landry, Blish & Cavanagh, Providence, R.I., for Scott Brass Inc.

Rosanna Sattler, Posternak, Blankstein & Lund, Boston, Mass., for 1st Londonderry Dev. Corp. Capital Hill Assoc. etc.

Anthony M. Traini, Randolph, Mass., for Mark Ostroff.

David Jones, McDermott & Rizzo, Boston, Mass., for Chemical Waste Management of N.J., Inc.

Martha V. Gordon, Merrill & Broderick, Manchester, N.H., for Beggs & Cobb.

## MEMORANDUM AND ORDER

WOLF, District Judge.

The United States, the Commonwealth of Massachusetts and the State of New Hampshire ("plaintiffs") brought these three consolidated actions under sections 107(a) and 113 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA" or "Superfund"), 42 U.S.C. §§ 9607(a) and 9613, and under the applicable laws of Massachusetts and New Hampshire. Plaintiffs seek to recover the costs which they have incurred concerning four hazardous substance disposal sites and to obtain a declaration that the 84 defendants are liable for future environmental response costs at those sites. These defendants include parties who are alleged to be owners or operators of one or more of the sites, or generators or transporters of hazardous substances sent to one or more of the sites. Plaintiffs contend that these defendants are strictly, jointly and severally liable for the costs of cleaning-up each site with which they were involved.

Currently before this court are the plaintiffs' Motions for Entry of Two Partial Consent Decrees as Final Judgments involving 59 defendants. Under the proposed First Partial Consent Decree (the "Major PRP Consent Decree"), 47 settling defendants agree to undertake remedial actions at three of the four sites involved in this case, and to pay $18,855,000 to the United States and the State of New Hampshire to reimburse them for the environmental response costs [1] incurred at two of

---

1. The terms "response cost" and "response action" encompass, but are not limited to, site cleanup. The statute defines "response" or "respond" as "remove, removal, remedy, and remedial action." 42 U.S.C. § 9601(25). "Remove" or "removal" are defined as:

the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous sub-

stances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release.…

the four sites. The settling defendants who have signed the Major PRP Consent Decree have agreed to accept the risk of increased costs of cleanup and may be liable for correcting undiscovered conditions at the sites. Approval of the Major PRP Consent Decree, and its entry as a final judgment, is opposed by seven non-settling defendants.

Under the proposed Second Partial Consent Decree, (the *"De Minimis* PRP Consent Decree"), twelve other defendants agree to pay the United States, the Commonwealth of Massachusetts and the State of New Hampshire $792,000 to settle their liability for certain response costs already incurred. The non-settling defendants who oppose the Major PRP Consent Decree have not opposed approval of the *De Minimis* PRP Consent Decree. However, these non-settling defendants have raised questions about the fairness of the two Consent Decrees as they relate to one another.

Also before the court are the settling defendants' Motions to Dismiss the Cross–Claims of Non–Settling Defendants for contribution and indemnification. Several settling defendants also oppose Motions to Amend Answers to Add Cross–Claims for contribution and indemnification brought by some non-settling defendants.

For the reasons stated in this opinion, plaintiffs' Motions for Entry of Two Partial Consent Decrees as Final Judgments will be allowed. The Motions to Dismiss Cross–Claims will also be allowed. The Motions of Non–Settling Defendants to Amend Answers to Add Cross–Claims for contribution and indemnity will be denied.

I. Background

A. *Nature of Claims*

As indicated earlier, these actions were brought by the United States, the Commonwealth of Massachusetts, and the State of

New Hampshire, under sections 107 and 113 of CERCLA, 42 U.S.C. §§ 9607, 9613, and relevant state laws. Plaintiffs seek to recover costs already incurred and to obtain a declaratory judgment requiring payment of costs to be incurred in relation to four Superfund National Priorities List hazardous waste sites—sites designated annually by EPA for remedial attention. *See* 42 U.S.C. § 9605. Two of the sites are in Bridgewater and Plymouth, Massachusetts. The other two sites are in Londonderry and Nashua, New Hampshire. The States' complaints contain the same allegations as those in the action brought by the United States, but are concerned only with the two sites within their respective jurisdictions.

In CERCLA, Congress created a framework for the United States and the states to respond to releases and threatened releases of hazardous substances into the environment. Under section 104(b) of CERCLA, 42 U.S.C. § 9604(b), the United States is authorized to investigate such releases or threatened releases of hazardous substances, and to respond to those releases in order to protect public health and the environment. Section 105 of CERCLA, 42 U.S.C. § 9605, requires the United States to adopt a National Contingency Plan, codified at 40 C.F.R. § 300, which sets forth the procedures to be followed and the criteria to be considered in implementing a response action.

Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), allows the United States and the States to sue to recover response costs incurred at a facility where there has been a release or threatened release of hazardous substances. Recovery is available against: (1) the current owner or operator of the facility; (2) the owner or operator of the facility at the time of disposal of the hazardous substances; (3) persons who arranged for disposal of hazardous substances (often called "generators"); and (4)

*Id.* § 9601(23). "Remedy" or "remedial action" are defined as:

    those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the en-

vironment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment....

*Id.* § 9601(24).

the transporters of hazardous substances to the facility.

The complaints in these cases include the following allegations. The Cannons Engineering Corporation ("Cannons"), and its principals J. Robert Cannon and J. Scott Cannon, operated a hazardous substance storage and incineration facility in Bridgewater, Massachusetts from 1974 to 1980. Cannons accepted for disposal wastes containing hazardous substances and held such wastes in a series of interconnecting holding tanks where the wastes were mixed together. United States Complaint ¶¶ 79–81. Cannons also rented a storage site in Plymouth from defendant Saltwater Trust, and transported excess wastes from the tanks at the Bridgewater site to two tanks at the Plymouth site. United States Complaint ¶ 92. Cannons also arranged with John Tinkham and companies under his control to take wastes from the holding tanks at the Cannons' Bridgewater facility and haul them elsewhere. Tinkham and his drivers took such wastes to sites in Nashua and Londonderry. United States Complaint ¶¶ 105, 119–129, 123–124.

During and since the times of disposal, there have been releases and threatened releases of hazardous substances into the environment at each of these four sites. United States Complaint ¶ 132. The United States Environmental Protection Agency ("EPA"), Massachusetts and New Hampshire have investigated the nature and characteristics of the hazardous substances found at each of these four sites. EPA has listed the Bridgewater, Plymouth, Nashua and Londonderry sites on the Superfund National Priorities List. United States Complaint ¶¶ 84–87, 94–99, 107–15, 126–128.

### B. Settlements

Section 122 of CERCLA, which was added to the law by the Superfund Amend-

ments and Reauthorization Act of 1986, P.L. 99–499, § 101 et seq., 100 stat. 1613 ("SARA"), identifies several types of settlements which the United States may enter into with potentially responsible parties ("PRPs") in a CERCLA action. 42 U.S.C. § 9622. Under section 122, the United States generally may enter into a Consent Decree which provides for the PRPs to reimburse the United States for response costs incurred, or under which the PRPs agree to undertake response activities themselves. In such settlements, the United States may provide the settling parties with a covenant not to sue concerning their liability; however, except in extraordinary circumstances, that covenant will not extend to liability for unknown conditions discovered in the future.[2] See 42 U.S.C. § 9622(f). Once a settlement has been concluded between a PRP and the United States, that PRP is protected by operation of law from liability to any other PRP who may seek contribution from the settling party. See 42 U.S.C. § 9613(f)(2).

Section 122(g) of CERCLA, 42 U.S.C. § 9622(g), establishes special terms on which the United States may settle with de minimis PRPs. A de minimis PRP is one whose contribution is minimal both in the amount and toxicity of the hazardous substances involved. In such settlements, the United States may provide a complete covenant not to sue for all further liability with respect to the facility. See 42 U.S.C. § 9622(g)(2). PRPs who enter into de minimis settlements are also entitled to protection against suits for contribution by other PRPs. See 42 U.S.C. § 9622(g)(5).

In this case, EPA conducted an intensive investigation to identify PRPs who may be liable for the costs of cleaning up the four sites and to determine the PRPs' contribution of waste to the sites. EPA notified 671 PRPs that they were potentially liable. Then plaintiffs began an extensive series of

---

**2.** 42 U.S.C. § 9622(f)(6)(B) provides that the reopener exception to the covenant not to sue need not be exercised in "extraordinary" cases. EPA must determine whether such a case exists based on an analysis of conditions at the site, the remedy chosen (see id. § 9622(f)(4)) "and volume, toxicity, mobility, strength of evidence,

ability to pay, litigative risks, public interest considerations, precedential value, and inequities and aggravating factors. . . ." EPA must also determine that not suing is consistent with providing "reasonable assurances that public health and the environment will be protected. . . ." Id.

settlement negotiations. Prior to filing this action, the plaintiffs were able to negotiate administrative settlements with 300 *de minimis* PRPs, none of whom are parties to this action. Subsequently, plaintiffs negotiated two settlements with 59 PRPs, which are embodied in the proposed Consent Decrees now before this court.

### 1. *The Administrative De Minimis Settlement*

In 1987 and 1988, the United States and the States made a settlement proposal under the *de minimis* settlement provisions of section 122(g) of CERCLA, 42 U.S.C. § 9622(g), to all the PRPs identified as generators of less than one percent of the waste that was sent to the four sites. The offer was based on a PRP's "volumetric share"—the ratio of the volume of waste that each *de minimis* PRP sent to each of the four sites to the total amount of wastes sent to each of the four sites. A PRP's volumetric share was then multiplied by the estimated total of response costs for each site. Then, the United States and the States offered to settle with each *de minimis* PRP for 160 percent of its volumetric share of the estimated response costs.

The settlement figure of 160 percent of a PRP's volumetric share consisted of two components: (1) a revenue component equal to 100 percent of a PRP's volumetric share of estimated costs of cleanup of all four sites; and (2) a premium component equal to 60 percent of a PRP's volumetric share to cover any unexpected costs or unknown conditions which may be discovered in remediating the four sites. In return for this premium, the participants in this early settlement received a complete covenant not to sue to recover any additional amounts at a time when the plaintiffs had not completed environmental assessments for cleaning up all the sites and thus had

not ascertained the final estimate of response costs at the sites. The settling defendants, therefore, obtained a complete limitation on their liability.[3] Plaintiffs, through the settlement premium, received a contribution to possible excess cleanup costs for known conditions and to cleanup costs for conditions which may be discovered at the sites in the future. The settling PRPs also paid an administrative charge.

In a cover letter accompanying the initial *de minimis* administrative settlement offer, the United States warned the eligible PRPs that:

> The government is anxious to achieve a high degree of participation in this *de minimis* settlement. Accordingly, the terms contained in this settlement offer are the most favorable terms that the government intends to make available to parties eligible for *de minimis* settlement in this case.

These terms were accepted by 300 PRPs and raised approximately $13,560,000.[4] None of the 300 PRPs who joined these settlements are parties in this case.

### 2. *The Major PRP Consent Decree*

Since before the commencement of this litigation, plaintiffs have engaged in settlement negotiations with the remaining PRPs, including larger-scale PRPs who had been ineligible for the administrative *de minimis* settlement and *de minimis* parties who had rejected that settlement. The PRPs formed a Steering Committee to represent their interests in the negotiations. These negotiations resulted in the two proposed Consent Decrees which are now before the court. Forty-seven defendants have agreed to the Major PRP Consent Decree, including generator and transporter defendants and the owners of the Plymouth and Londonderry sites.[5]

---

**3.** These settling PRPs are also not subject to suits for contribution. *See* 42 U.S.C. § 9622(g)(5).

**4.** Before the settlements became final, EPA published a notice in the Federal Register announcing the settlements, 53 Fed.Reg. 4070 (Feb. 11, 1988), and soliciting comments on the settlements. EPA made some changes in the final

Administrative Orders as a result of the comments received.

**5.** The generators joining this settlement are: Acushnet Company, American Cyanamid Co., American National Can Corp., A.T.C. Petroleum, Inc., AT & T Technologies, Inc., Atlantic Richfield, Inc., Bemis Co., New Jersey, Inc., Ciba-Ceigy, Inc., Clean Harbors of Braintree, Inc., Clean Harbors of Natick, Inc., Emhart Indus-

The Major PRP Consent Decree requires the settling parties to perform response actions at the Bridgewater, Plymouth and Londonderry sites, and to make payments with respect to the Plymouth and Nashua sites. More specifically, under this proposed settlement, the settling defendants would perform environmental response work at three sites with an estimated value of $15,940,000, *see* First Partial Consent Decree § 7, and make payments totaling $18,855,000 to the United States, Massachusetts and New Hampshire. *Id.* § 6. The settling defendants have also agreed to assume plaintiffs' costs of overseeing the defendants' response activities. *Id.* § 7, ¶ B. Moreover, an additional $120,000 would be placed in escrow for use if further response actions are needed at the Plymouth site. *Id.* § 6, ¶ 6.

In return, the United States, Massachusetts, and New Hampshire have provided a covenant not to sue these parties, qualified by specific re-opener provisions. *Id.* § 26. With respect to response costs at the Bridgewater, Plymouth and Londonderry sites, the United States and the States agree not to sue the settling defendants, except if information or site conditions unknown to the United States at the time of settlement indicate that the remedies provided for by the settlement are not adequate to protect public health and the environment. *Id.* § 26, ¶ B. With respect to the Nashua site, the United States and New Hampshire agree not to sue the settling defendants for response costs, unless plaintiffs spend more than $19,000,000 at that site after January 1, 1988. *Id.* § 26, ¶ E.

Thus, the total liability of the PRPs who have accepted the Major PRP Consent Decree is still uncertain. These PRPs have agreed to accept the risk that the actual costs of cleanup may be higher than currently estimated. They may also be subject to liability for conditions discovered at these sites in the future which are currently unknown.

As indicated earlier, as provided by section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), none of the settling parties may be sued for contribution by other PRPs for the subject matters covered by the settlement. First Partial Consent Decree § 27.

### 3. *The De Minimis PRP Consent Decree*

Beginning prior to filing this action, the plaintiffs offered another opportunity to settle to the PRPs who had been eligible to join the administrative *de minimis* settlement, but who had rejected the initial offer. This offer resulted in the *De Minimis* PRP Consent Decree now before the court. As with the administrative settlement, this settlement was offered, under 42 U.S.C. § 9622(g), to parties who had sent less than one percent of the volume of hazardous waste to the sites.

Under the terms of the *De Minimis* PRP Consent Decree, eligible PRPs may resolve their liability to the plaintiffs by paying 260 percent of their volumetric share of the estimated costs of the response actions at these sites. This settlement figure incorporated the 160 percent figure used in the earlier administrative settlement, increased by a surcharge of 100 percent of a settling PRP's volumetric share. The surcharge was designed to reward and encourage early settlement in this and other CERCLA cases. The surcharge will also further reduce the amounts sought by the plaintiffs from the major PRPs and the non-settling defendants.

tries, Inc., *Fairchild Semiconductor Corp.*, Foxboro Company, Franklin Pumping Service, Inc., General Electric Company, Globe Newspaper Company, Hoechst–Celanese Corp., Hoffman–LaRoche, Inc., ICI Americas, Inc., Millipore Corp., Monsanto Co., Pfizer, Inc., Polaroid Corp., and Tech Etch, Inc. The Plymouth landowners joining this settlement are: Saltwater Trust, Frances C. Rogerson, Jr., Arthur B. Blackett and Konrad Gesner. The Londonderry land-

owners joining this settlement are: Judy M. Tinkham, Fred L. Tinkham, Fred S. Tinkham, Tinkham Realty, Tinkham Realty, Inc., Tinkham Investments, Londonderry Green Associates, Londonderry Green Realty Trust, First Londonderry Development Corp., Capital Hill Associates, Northgate Management Corp., Beaver Lake Realty Corp., Sidehill Realty Corp., Dennis S. Sargent, Dolores M. Paino, John F. Paino and Richard Clery.

Twelve *de minimis* generator defendants have agreed to the *De Minimis* PRP Consent Decree.[6] Under this Consent Decree, the settling *de minimis* PRPs agree to pay a total of $792,000 in return for a covenant not to sue these defendants for response costs with respect to these sites. Second Partial Consent Decree §§ 3, 4 & Appendix A. Also, under section 122(g)(5) of CERCLA, 42 U.S.C. § 9622(g)(5), these defendants are protected against suits for contribution brought by other PRPs. Second Partial Consent Decree § 7.

### 4. *Status of Nonsettling Defendants*

Approval of the two pending proposed Consent Decrees, along with the prior administrative settlements, would resolve the claims of the United States, Massachusetts and New Hampshire against 359 PRPs and result in a recovery, including the value of PRP performance and cash payments, with an estimated value of $48,000,000. The precise value of these settlements cannot be ascertained because the actual costs of cleanup for the Bridgewater and Londonderry sites cannot be determined until the agreed-upon remedies are implemented by the settling defendants and until it is determined whether the major PRPs will have financial responsibility for correcting any conditions which are now unknown.

Not all of the money previously spent at the four sites by plaintiffs would be recovered as a result of the settlements now proposed. The United States, Massachusetts and New Hampshire seek to recover the remainder of their past costs incurred from the 25 non-settling defendants in this action, and to obtain a declaratory judgment against those defendants to establish their liability for future costs that are not covered by the re-opener provisions of the Major PRP Consent Decree. The plaintiffs consider some of these non-settling defendants to be *de minimis* generators and others to be major PRPs. However, having failed to accept any of the proposed settlements in a timely manner, the non-settling defendants are not now eligible to become parties to either proposed Consent Decree.

### C. *Public Comment*

Pursuant to section 122(i) of CERCLA, 42 U.S.C. § 9622(i), and United States Department of Justice policy, codified at 28 C.F.R. § 50.7, notice of the two Proposed Consent Decrees was published at 53 Fed. Reg. 29959 on August 9, 1988 to allow for a 30–day public comment period. These provisions allow interested members of the public to submit comments on proposed Consent Decrees before they are considered by the court. Under section 122(i) of CERCLA and 28 C.F.R. § 50.7, the Department of Justice is required to respond to the comments that are submitted, and may withdraw or withhold its final agreement to any proposed Consent Decree.

The public comment period concerning the proposed Consent Decrees closed on September 8, 1988. No comments were received by the Department of Justice.

## II. *The Merits of the Proposed Consent Decrees*

### A. *Standard of Review*

■ Approval of a proposed consent decree is committed to the discretion of the district court. *United States v. Hooker Chemical & Plastics Corp.*, 776 F.2d 410, 411 (2d Cir.1985). This discretion is to be exercised in light of the strong policy in favor of voluntary settlement of litigation. *Id.* The presumption in favor of settlement is particularly strong where a consent decree has been negotiated by the Department of Justice on behalf of a federal administrative agency "specially equipped, trained or oriented in the field...." *United States v. National Broadcasting Co.*, 449 F.Supp. 1127, 1144 (C.D.Cal.1978). EPA is such an agency.

■ In order to approve a consent decree, the court must determine that the

---

**6.** They are Benson–Goss Fuels, Century Lumber Co., City of New Bedford, Clifton Adhesive, Inc., Giusti Baking Company of New England, Ken–Lac Chemical Co., Inc., The O'Day Boat Corpo-

ration, Petro Serv., Inc., Polyply Corp., Providence College, Victory Pearl, Inc., and Wright Oil Co., Inc.

settlement is fair, reasonable, and consistent with the Constitution and the mandate of Congress. *City of New York v. Exxon,* 697 F.Supp. 677, 692 (S.D.N.Y.1988); *United States v. Seymour Recycling Corp.,* 554 F.Supp. 1334, 1337–38 (S.D.Ind.1982). Protection of the public interest is the key consideration in assessing these factors. *Id.* at 1337; *Acushnet River & New Bedford Harbor: Proceedings re Alleged PCB Pollution,* 712 F.Supp. 1019, 1028 (D.Mass.1989).

■■■■ With regard to approval of a consent decree, the controlling criteria is not what might have been agreed upon, *Officers for Justice v. Civil Service Commission,* 688 F.2d 615, 625 (9th Cir.1982), nor what the district court believes might have been the optimal settlement. *Armstrong v. Board of School Directors of City of Milwaukee,* 616 F.2d 305, 315 (7th Cir.1980). The reviewing court does not have the power to modify a consent decree; it may only approve or reject it. *United States v. Jones & Laughlin Steel Corp.,* 804 F.2d 348 (6th Cir.1986); *Officers for Justice v. Civil Service Commission,* 688 F.2d 615, 630 (9th Cir.1982); *Walsh v. Great Atlantic & Pacific Tea Co.,* 726 F.2d 956, 965 (3rd Cir.1983).

■■■■ The court's proper role in determining whether a proposed settlement should be approved was succinctly stated in *City of New York:*

> In assessing [the above factors], however, the Court's role is not unlimited. Settlements are to be encouraged and the court does not "have the right or the duty to reach any ultimate conclusions on the issues of fact and law which underlie the merits of the dispute." [*City of Detroit v. Grinnell Corp.,* 495 F.2d at 448, 456 (2d Cir.1974)]. And "where there has been arms length bargaining among the parties (and) sufficient discovery has taken place to enable ... counsel to evaluate accurately the strengths and weaknesses of the plain-

tiff's case ... there is a presumption in favor of the settlement," *Wellman v. Dickinson,* 497 F.Supp. 824, 830 (S.D.N.Y.1980), *aff'd,* 647 F.2d 163 (2d Cir.1981), particularly where "a government agency committed to the protection of the public interest" has participated in and endorsed the agreement. *Id.*[;] [*cf. Federal Trade Comm'n v. Standard Financial Mgt. Corp.,* 830 F.2d 404, 408 (1st Cir.1987) (holding that the trial court "should accord some substantial deference to [an] agency's determination that [a] settlement is appropriate" in a deceptive trade practices case) (citation omitted)]. Finally, in addition to the general federal policy favoring settlements, *see Florida Trailer & Equipment Co. v. Deal,* 284 F.2d 567, 571 (5th Cir.1960), the reviewing court must be mindful that Congress, in enacting the 1986 amendments to CERCLA sought to "expedite effective remedial actions and minimize litigation." Section 122(a).

The balance to be struck between the policies favoring settlements and the need to safeguard the public interest in cases of this type was best summarized in *United States v. Carrols Development Corp.,* 454 F.Supp. 1215 (N.D.N.Y.1978):

> It is not the Court's function to determine whether this is the best possible settlement that could have been obtained but rather the Court's duty is to determine "whether the settlement is within the reaches of the public interest." *Id.* at 1222 (quoting *United States v. Gillette Company,* 406 F.Supp. 713, 716 (D.Mass.1975)).

*City of New York,* 697 F.Supp. at 692–93.

In the instant case, the non-settling defendants challenge the Major PRP Consent Decree only on the basis of fairness and do not oppose approval of the *De Minimis* PRP Consent Decree.[7] Nevertheless, the court must determine that each proposed Consent Decree conforms to all legal requirements and is reasonable. *See United*

---

**7.** Although the non-settling defendants have not opposed approval of the *De Minimis* PRP Consent Decree, they have asserted that some of its provisions are unfair, particularly as they com-

pare to the Major PRP Consent Decree. The court must consider these arguments in determining whether the *De Minimis* PRP Consent Decree should be approved.

*States v. City of Jackson,* 519 F.2d 1147, 1151 (5th Cir.1975) (the court must "assure itself that there has been valid consent by the concerned parties and that the terms of the Consent Decree are not unlawful, unreasonable, or inequitable"). In this case, all of the relevant standards have been satisfied.

### 1. *Legality*

The non-settling defendants do not contend that either proposed Consent Decree is inconsistent with the Constitution or the provisions of CERCLA.[8] It is, in any event, evident to the court that the proposed Consent Decrees are consistent with the Constitution and CERCLA.[9]

CERCLA provides for joint and several liability where there is an indivisible harm to the environment. 42 U.S.C. § 9607; *e.g., O'Neil v. Picillo,* 682 F.Supp. 706, 722–23 (D.R.I.1988); *United States v. Stringfellow,* 661 F.Supp. 1053, 1060 (C.D.Cal. 1987). To mitigate the potential harshness of these provisions, it also contains settlement provisions "to facilitate agreements that are in the public interest and consistent with the National Contingency Plan in order to expedite effective remedial actions and minimize litigation." 42 U.S.C. § 9622(a). Congress intended that settlements would be structured recognizing that "strict, joint, and several liability is an element of the law," 132 Cong.Rec. S14903 (Oct. 3, 1986) (remarks of Sen. Stafford), and thus provided the government the "enforcement tools to persuade PRPs to clean up a site quickly and effectively so that people are no longer exposed to hazardous substances." *Id.* at S14918 (remarks of Sen. Mitchell).

Consistent with Congress' view that settlements may take different forms, the pending proposed Consent Decrees call for the performance of work, payment of cash, and *de minimis* settlements. *See* 42 U.S.C. § 9622(a), (b), (g), (h). Moreover, Congress envisioned that there may be a series of different settlements with different PRPs in the course of the same action. *See id.* § 9622(e)(2)(C), (f)(2). In this instance, the plaintiffs negotiated two settlements with *de minimis* PRPs, and a single settlement with the major PRPs.

The two *de minimis* settlements, in which 312 PRPs are participating, are also consistent with Congress' intention that the government negotiate with minor contributors of waste to a site "as promptly as possible." *Id.* § 9622(g)(1). To encourage such settlements, Congress empowered the United States to provide *de minimis* parties with a complete covenant not to sue for future liability concerning a Superfund site,[10] including liability for unknown conditions and future costs. *Id.* § 9622(g)(2). These provisions have been included in the *De Minimis* PRP Consent Decree. By contrast, the government may not provide parties who are ineligible for *de minimis* treatment with a covenant not to sue for future liability except under extraordinary circumstances. *Id.* § 9622(f)(6). Consistent with this, the Major PRP Consent Decree provides the major PRPs with contribution protection, but requires the settling defendants to remain liable for unknown and unanticipated conditions at the sites.

In assessing the legality of the proposed settlement, the court must consider Congress' intentions with respect to the treatment of non-settling parties. It is clear that Congress intended to favor settling

---

**8.** Of course, the non-settling defendants' arguments that certain provisions of the Consent Decrees are unfair, *infra,* raise questions about the governments' implementation of CERCLA. The non-settling defendants also challenge the contribution protection provisions of CERCLA on constitutional and other grounds. This argument is analyzed *infra* when defendants' cross-claims are addressed.

**9.** CERCLA has been upheld against claims that it violates the equal protection clause, the due process clause, the contracts clause and the *ex*

*post facto* clause of the Constitution. *See United States v. Monsanto Co.,* 858 F.2d 160, 174–75 (4th Cir.1988); *United States v. Conservation Chemical Corp.,* 619 F.Supp. 162, 216–21 (W.D. Mo.1985).

**10.** A Superfund cite is one for which expenditure of funds from the Hazardous Substance Superfund have been authorized pursuant to 42 U.S.C. § 9611. National Contingency Plan sites are eligible for Superfund moneys. *See* 42 U.S.C. § 9611(a)(3).

parties over those who reject settlement offers, because it extended to settling parties complete protection from contribution actions. *Id.* §§ 9613(f)(1), 9622(g)(5). Congress also gave the United States the authority to settle with some PRPs and pursue non-settlers for the remainder of the costs of the cleanup. *Id.* § 9613(f)(2). It is precisely because the plaintiffs have pursued this strategy that the non-settling defendants view the Major PRP Consent Decree as unfair. Non-settling defendants remain subject to strict liability and joint and several liability. This is, however, consistent with CERCLA.

### 2. *Reasonableness*

■ Courts have considered several criteria to determine whether a Superfund settlement is "reasonable." These include: (1) the nature and extent of the hazards at the site; (2) the degree to which the remedy provided for a consent decree will adequately address the hazards present at the site; (3) the possible alternative approaches for remedying the hazards at the site; (4) the extent to which a consent decree furthers the goals of the statutes that form the basis of the litigation; and (5) the extent to which the court's approval of a consent decree is in the public interest. *United States v. Conservation Chemical Co.*, 628 F.Supp. at 401, *relying on Seymour Recycling Corp.*, 554 F.Supp. at 1339.

■ These criteria reflect the court's "limited duty" to inquire into the technical aspects of the cleanup program proposed by a consent decree in order to ensure that the proposed settlement adequately addresses environmental and public health concerns. *See United States v. Hooker Chemicals & Plastics Corp.*, 540 F.Supp. 1067, 1072 (W.D.N.Y.1982). Since selection of a remedy involves balancing numerous complex technical factors within EPA's expertise, Congress provided that the remedy selected by EPA must be upheld unless the

agency was arbitrary and capricious in its selection. 42 U.S.C. § 9613(j)(2) ("In considering objections raised in any judicial action under this Act, the court shall uphold the President's decision in selecting the response action unless the objecting party can demonstrate, on the administrative record, that the decision was arbitrary and capricious or otherwise not in accordance with law.").

■ The non-settling defendants do not challenge the Major PRP Consent Decree on the grounds that the technical approach it adopts is arbitrary and capricious. To the extent they argue that this Consent Decree does not further CERCLA's goals, they object to the fairness of its apportionment of costs rather than to any technical defect in the chosen remediation strategies. Nevertheless, the court has considered the reasonableness of these strategies.

The technical approach of the Major PRP Consent Decree at each of the sites was selected in accordance with the National Contingency Plan, which describes criteria for evaluating the threat posed by hazardous waste sites and for response actions. 42 U.S.C. § 9605.

With respect to the Bridgewater site, the settling defendants have agreed to undertake EPA's remedial action. First Partial Consent Decree § 7, ¶ A, iv. This remedy involves the excavation and treatment of contaminated soil, the decontamination of buildings and tanks, fencing, groundwater monitoring, and a wetland restoration program, at an expected value of $5,580,000.[11] At Plymouth, EPA and some of the settling parties already have removed and decontaminated the waste holding tanks and sampled soil and other media. The settling defendants who have joined the Major PRP Consent Decree have already begun to remove the contaminated soil from the Plymouth site, at an expected value of $460,-

---

**11.** Actual costs may be higher. Under the Major PRP Consent Decree, the settling defendants assume the risk of any cost increases. In addition, some of the settling defendants have previously removed bulk chemicals on the site under an administrative agreement with EPA. A summary of the remedial measures to be undertaken at the Bridgewater site is contained in the "Bridgewater RD/RA Plan." *See* First Partial Consent Decree, Appendix D.

000.[12] The Plymouth landowners have agreed to pay the United States $120,000, to be held in escrow in case additional response work is needed at that site. *Id.* § 6, ¶ G.

At the Londonderry site, the major PRPs will perform treatment of contaminated soils and groundwater, and a wetlands assessment.[13] *Id.* § 7, ¶ A. This remedial work has an expected value of $9,900,000.[14]

The Major PRPs are also required to pay the plaintiffs' costs of overseeing the cleanup at the Bridgewater, Plymouth, and Londonderry sites. *Id.* § 7, ¶ B.

At the Nashua site, the United States and New Hampshire have been undertaking remedial action since 1982; they have constructed an underground slurry wall and a membrane cap to control the wastes; they have installed a system to pump contaminated groundwater out of the aquifer and treat it to remove contaminants; they have funded extensions of existing municipal drinking water supplies to residents. United States Complaint ¶¶ 106–115. Under the Major PRP Consent Decree, the settling generators would pay the United States and New Hampshire $15,263,000 toward past costs and $2,657,000 in premium payments toward future costs, for a total payment of $17,920,000.[15] First Partial Consent Decree § 6, ¶¶ A–E.

In the absence of any objection on the part of any of the defendants and the absence of any intervenors in these actions, the court concludes that the plaintiffs' choices of technical remedies are not arbitrary and capricious. On the contrary, the remedies appear to be reasonable and in accordance with the National Contingency Plan. Detailed studies have been performed at each site. EPA has solicited public comments on the selection of a remedy, and issued Records of Decision that selected remedies based on the administrative record. United States Complaint ¶¶ 84–87, 94–99, 126–128. Because EPA is "specifically equipped, trained [and] oriented in the field" of hazardous waste site cleanup, *see United States v. National Broadcasting Co.*, 449 F.Supp. 1127, 1144 (C.D.Cal.1978), and there is no objection by any party or non-party to the technical approach of these remedial actions, it is particularly appropriate that the court accept EPA's choice of remedy.

In addition, it is important to note that if these settlements are not approved and a trial is necessary, it is likely that several years will be required to complete discovery and decide pretrial motions. The results of a trial, and any possible appeals, are inevitably uncertain. If the pending proposed Consent Decrees are not approved it would, at a minimum, likely be several years before plaintiffs recover anything in this action. In the interim, the Superfund would have to bear the costs of cleaning up the Bridgewater and Londonderry sites, and the money previously spent at the Plymouth and Nashua sites would go unrecovered. Thus, during the pendency of this action, less money would be available for other hazardous waste sites throughout the country.

### 3. *Fairness*

In evaluating the fairness of a proposed consent decree, a court should examine both the procedural and substantive aspects of the decrees. *See United States v. Hooker Chemical & Plastics Corp.*, 607 F.Supp. 1052, 1057 (W.D.N.Y.), *aff'd*, 776 F.2d 410 (2d Cir.1985) (in determining whether settlement is fair, court should

---

**12.** A summary of this removal activity is contained in the "Plymouth Site Removal Plan." First Partial Consent Decree, Appendix E.

**13.** A summary of these remedial measures is contained in the "Londonderry Site DA/RA Plan," which is attached to the Major PRP Consent Decree as Appendix C.

**14.** Again, actual costs may be higher, but under the Major PRP Consent Decree, the settling parties have assumed the risk of any cost increases.

**15.** The United States and New Hampshire would recover an additional $5,240,000 toward the costs of cleaning up the Nashua site through the administrative settlements and the *De Minimis* PRP Consent Decree. Thus, under all settlements, the United States and New Hampshire would receive $23,160,000 for Nashua, which would recoup all past costs and provide some funds toward future costs.

look to factors such as "the good faith efforts of the negotiators, the opinions of counsel, and the possible risks involved in litigation if the settlement is not approved"). Fairness should be examined from the standpoint of signatories and non-parties to the decree. *Conservation Chemical*, 628 F.Supp. at 401. The effect on non-settlers should be considered, but is not determinative in the court's evaluation. *Acushnet River*, 712 F.Supp. at 1029.

### a. Procedural Integrity

■ Although the non-settling defendants acknowledge that it may be necessary to encourage early settlement with *de minimis* generators in this and other cases, Kingston–Warren argues that the procedure employed by the plaintiffs in negotiating with the *de minimis* parties was unfair. Kingston–Warren claims that it participated in the meetings of the Steering Committee that negotiated the Consent Decrees with the expectation that it could join the Major PRP Consent Decree. Kingston–Warren claims that it was surprised when it was later informed by EPA that it could not.

Kingston–Warren's contentions do not, however, render the proposed Consent Decrees procedurally unfair. The Consent Decrees were negotiated at arms length by experienced counsel on both sides. All PRPs, including those who now object to the Major PRP Consent Decree, had an opportunity to participate in the settlement process and to be represented on the Steering Committee that negotiated the Consent Decrees. Consistent with Congress' intent that *de minimis* settlements should be negotiated "as promptly as possible," 42 U.S.C. § 9622(g)(1), the plaintiffs began the settlement process by negotiating the terms of an administrative settlement offer

with the *De Minimis* Subcommittee of the Steering Committee, which represented the interests of the *de minimis* PRPs. This offer was extended to the 367 parties who were each responsible for less than one percent of the wastes sent to the four Cannons hazardous waste sites.[16] Although the record does not demonstrate that the *de minimis* parties were explicitly told that they would not be able to participate in the Consent Decree of their choice, the existence of separate negotiations with the *De Minimis* Subcommittee and the statutory provisions that specifically address *de minimis* settlements should have been adequate to indicate to Kingston–Warren and other similarly situated PRPs that a separate, *de minimis* settlement was possible, if not likely.

Although 42 U.S.C. § 9622(g) permits settlements with *de minimis* generators, it does not require that *de minimis* generators be excluded from other settlements. However, not allowing *de minimis* PRPs to join the Major PRP Consent Decree is within EPA's discretion and is not unfair.

Allowing PRPs to join the settlement of their choice might frustrate the statutory purpose of encouraging early settlement, particularly by *de minimis* parties, thus immeasurably complicating CERCLA litigation and injuring the public interest in prompt cleanup. *See Seymour Recycling*, 554 F.Supp. at 1339 ("There is a public interest in encouraging parties to come forward first in an effort to settle enforcement cases."). In fact, the statutory scheme is designed to discourage "free riders" by imposing a greater share of cleanup costs on those who delay agreeing to contribute to remedial action. The primary way to discourage free riders is to impose a cost for delay.

---

**16.** This offer was not made to Crown Roll Leaf, Inc., one of the objecting defendants, because Crown Roll had failed to respond to an information request issued by EPA under CERCLA § 104(e), 42 U.S.C. § 9604(e), and under the Resource Conservation and Recovery Act § 3007, 42 U.S.C. § 6927, to all the PRPs, requesting written information and documents concerning the amount and nature of the waste Crown Roll had sent to the Cannons sites. This information was used to verify the amount and nature of the waste sent by each party to the sites and provide a basis for settlement. Compliance with the Information Request was a prerequisite to settlement. Despite two reminder letters to Crown Roll, no response was received. Thus, to the extent that Crown Roll is adversely affected by its inability to participate in any of the settlements, it is suffering from a self-inflicted wound.

Accordingly, when *de minimis* generators were offered the administrative settlement, the United States warned the 367 eligible parties that it was the best offer they would receive. Consistent with the warning, when the United States and the States offered to permit the parties who had rejected the administrative *de minimis* settlement an opportunity to join the *De Minimis* PRP Consent Decree, the plaintiffs demanded that these parties pay a surcharge. It would be inconsistent with this approach to allow some *de minimis* PRPs to join in a separate settlement they now find more attractive.

In addition, the plaintiffs correctly contend that allowing *de minimis* generators to join the Major PRP Consent Decree at this time would have little, if any, economic value to the United States, Massachusetts or New Hampshire. Other parties have already agreed to assume the cost and risk of conducting the cleanups at Bridgewater and Londonderry, and the cleanup at Plymouth has already been undertaken. The non-settling *de minimis* generators' offer to participate in doing this work would simply operate to limit the cost to other defendants, but provide nothing to the plaintiffs. Unless the remaining *de minimis* defendants are willing to undertake completion of the remedy at the Nashua site, the only type of settlement with value to the plaintiffs would be a cash settlement. The *de minimis* defendants who object to the Major PRP Consent Decree have not, however, offered anything of value to plaintiffs in return for allowing them to join that settlement.

#### b. *Allocation of Costs Between Major and De Minimis Parties*

The non-settling defendants who oppose the Motions for Entry of Two Partial Con-

sent Decrees as Final Judgments [17] argue that the court should not approve the Major PRP Consent Decree because it ignores the comparative fault of the various defendants by favoring the major PRPs.[18]

Specifically, the non-settling defendants object to the 60 percent premium in the administrative *de minimis* settlement as allegedly being beyond any conceivable calculation of unforeseen costs. They also argue that the proposed *De Minimis* PRP Consent Decree, which charges a 100 percent penalty in addition to the 60 percent premium, constitutes a windfall to the major PRPs because the amount the *de minimis* generators will pay in excess of their volumetric shares will reduce the amount of the major PRPs' liability. Instead, the non-settling defendants seem to be arguing that liability should be based strictly on volumetric share.

The existence of different types of settlements in a single CERCLA action is not necessarily unfair. *See Seymour Recycling*, 554 F.Supp. at 1339. In *Seymour Recycling*, as in the instant case, there were two groups of defendants. One group agreed under a consent decree to undertake some of the remedial actions necessary at the site. Another group was settling on a "cash-out" basis and receiving a covenant not to sue. The court found nothing unfair in the United States' decision to structure the two settlements in different ways and to make separate settlement offers to different parties. As the court stated:

> While in total the sum being asked from those who are not a party to the Consent Decree is greater than the sum being paid by the 24 who are parties to the Decree, this does not render the govern-

17. These non-settling defendants oppose only the Major PRP Consent Decree. *See supra* at 1031. The Motions for Entry of Two Partial Consent Decrees as Final Judgments are opposed by seven non-settling defendants: Beggs & Cobb, Inc., Crown Roll Leaf, Inc., Cyn Oil Corporation, Kingston–Warren Corporation, Olin Hunt Specialty Products, Inc., Raymark Industries, Inc. and Scott Brass, Inc. All except Crown Roll were eligible to join the administrative *de minimis* settlement and then the *De*

*Minimis* PRP Consent Decree. Crown Roll was ineligible for either because it failed to provide the government with information as required under 42 U.S.C. § 9604. *See infra* page 1046.

18. The non-settling defendants have calculated the expected value of the major PRPs' cleanup work and their cash contributions to past costs and suggest that the major PRPs are settling for about 75 percent of their volumetric shares.

ment's approach unfair to any parties. Those who are parties to the Consent Decree took upon themselves the obligation to hire the subcontractor and to develop a work proposal by which the surface cleanup is to be completed without management (but with monitoring) by the United States and without respect to cost. Those companies who are not parties to the Decree have a number of choices. They may accept the government's offer for a cash settlement in return for a covenant not to sue; they may try to form a group of their own ... or they may chose to litigate with the United States....

554 F.Supp. at 1339.[19] *See also Acushnet River*, at 1032 ("Nor must this Court ensure that the settlement is perfectly calibrated in terms of shares of liability so long as it is generally fair and reasonable.").

In the instant case, the non-settling defendants' preoccupation with volumetric share is mistaken. In fact, neither Consent Decree is necessarily more attractive than the other. Comparing the settlements solely by volumetric calculation, as the non-settling defendants do, ignores the open-ended nature of the settling major PRPs' commitments under the Major PRP Consent Decree. The settlement contained in the Major PRP Consent Decree is based on requiring a group of parties to be jointly and severally liable for performance of the remedies to the plaintiffs' satisfaction at the Bridgewater, Plymouth and Londonderry sites,[20] as well as paying $17,920,000 toward the cleanup of the Nashua site and an additional $935,000 at the Plymouth site. Actual costs to the major PRPs cannot be ascertained until the cleanups are completed.[21] Remedial work at the Bridgewater and Londonderry sites has not even begun. The settling major PRPs have assumed the risk of encountering unknown environmental conditions or that the plaintiffs will require them to undertake additional cleanup activities which may further drive up the costs.[22] In addition, they run the risk of future transaction and litigation costs if disputes arise as to the re-opener terms of the Major PRP Consent Decree.

By contrast, under the *de minimis* settlement structure, contained in the initial

---

19. The plaintiffs state without any supporting citation that the Consent Decree in *Seymour* was criticized by some members of Congress because they believed that the scope of the covenant not to sue given to the settling parties was too broad and did not take into consideration future liability or unknown conditions. Plaintiffs note, however, that the covenant not to sue given the parties who joined the Major PRP Consent Decree in this case is much more restricted than the covenant given to the *Seymour* settlers, and expressly does not extend to future liability for unknown conditions.

20. The Major PRP Consent Decree involves a settlement offer made collectively to a group, which could only have been accepted by the group as a whole, or by substantially all of the members of the group. Unlike the *de minimis* settlements, each settling party's share of the "mega-settlement" was not calculated by the plaintiffs. Rather, the settling parties agreed under ¶ 25 of the Major PRP Consent Decree to be jointly and severally liable for the total obligation of performing the work and making the payments, and entered into separate agreements among themselves as to how they would allocate the costs.

21. This uncertainty in future costs is demonstrated by information submitted to the court since the May 9, 1989 hearing, which indicates that the expected value of future costs at the Nashua site,—the most advanced of the four clean-up efforts—has increased from $12.13 million to $13.77 million.

22. For example, at the Londonderry site, the settling parties agreed to meet specified remediation goals concerning the soil and groundwater. *See* First Partial Consent Decree, Appendix C. They will have to pay for moving soil and pumping groundwater until those goals are met, regardless of the length of time it takes or the cost. They will also have to pay the cost of EPA and New Hampshire's overseeing the project. *Id.* § 7, ¶ B. They may have to pay stipulated penalties if their performance is delinquent, and EPA and New Hampshire retain the right to impose additional, and more costly, cleanup obligations if the performance standards are not achieved or if human health and the environment are not adequately protected. *Id.* §§ 7, 24. The settling parties also agree to indemnify the governments against claims by third parties and assure that their contractors carry insurance. *Id.* § 20. Instead of obtaining finality, these parties have undertaken risk. By contrast, the parties who joined the *de minimis* settlements have no obligation except to pay a specified sum and are protected from claims for future costs.

administrative settlements and in the *De Minimis* PRP Consent Decree, eligible parties have an opportunity to obtain final resolution of liability in this case at a definite cost, which caps their exposure and saves them the cost of continued litigation. The filings of Giusti Baking Company, which is a party to the *De Minimis* PRP Consent Decree, demonstrate the high value placed on finality by the settling *de minimis* parties. Giusti argues that entry of the *De Minimis* PRP Consent Decree "will relieve the *de minimis* parties of the burdens of continued transaction costs, and future liability to EPA and other parties...." Memorandum of Giusti Baking Company of New Bedford in Support of its Motion for Entry of the *De Minimis* Consent Decree at 5.

In view of the risks the major PRPs are continuing to assume, the 60 percent premium in the *de minimis* settlements is within the range of being fair and reasonable in order to cover unexpected costs or unknown conditions found at the sites. Indeed, plaintiffs and several major PRPs assert that during settlement negotiations some major PRPS objected that the United States and the States had charged a premium that was too low and made the settlement offer to too many parties.

The non-settling defendants point out that the uncertainty concerning costs could have been reduced if the plaintiffs had waited longer before making the initial administrative settlement offer. However, although the plaintiffs' cost estimates have increased since the time of the original *de minimis* settlement offer, final costs will not be established for many years. The prompt offer of settlement to *de minimis* parties was clearly intended by Congress when it enacted section 122(g) of CERCLA, 42 U.S.C. § 9622(g). In this case, the plaintiffs accepted the recommendation of the *De Minimis* Subcommittee of the Cannons Steering Committee to offer a *de minimis* settlement to 300 *de minimis* parties as quickly as possible. This recommendation of prompt settlement reflects the strong

view of most of the *de minimis* parties that finality in this case is extremely valuable and well worth the 60 percent premium. It would have been unfair to delay an administrative settlement that is consistent with congressional intent when 300 other *de minimis* parties wanted the plaintiffs to consummate that settlement expeditiously.

The 100 percent penalty under the *De Minimis* PRP Consent Decree is not unfair and certainly was not unforeseeable. As indicated earlier, in the cover letter accompanying the initial *de minimis* administrative settlement offer, the United States warned the eligible parties:

> The government is anxious to achieve a high degree of participation in this *de minimis* settlement. Accordingly, *the terms contained in this settlement offer are the most favorable terms that the government intends to make available to parties eligible for de minimis settlement in this case.* (Emphasis added).

This warning was included to advise eligible *de minimis* parties that if they decided to reject the initial *de minimis* offer, they would face risks, particularly the risks of more costly settlements or joint and several liability. The plaintiffs point out that without such an incentive, few eligible parties would have accepted the administrative settlement. Although it is difficult to assess this contention empirically, 300 *de minimis* parties evaluated the risks, determined the initial offer was fair, and accepted the settlement. In addition, 12 more *de minimis* generators have accepted the terms of the *De Minimis* PRP Consent Decree.[23] The fact that a meaningful number of parties similarly situated to those who now object have agreed to the *De Minimis* PRP Consent Decree is added evidence of its fairness. *See Seymour Recycling*, 554 F.Supp. at 1339 (large number of acceptances of government's "cash-out" offer indicates fairness).

This court's finding that the 100 percent penalty for failing to have accepted

---

**23.** The plaintiffs also state without any supporting documentation that amount of the premium and the surcharge together—an additional 160 percent of each PRP's volumetric share—is equal to the amount of the premium alone in other CERCLA *de minimis* settlements.

the administrative *de minimis* settlement is not unfair in this case should not be construed as acceptance of the position argued by counsel for the United States that *any* amount of increase ought to be approved as long as the first settlement offer was reasonable. The extraordinary powers conferred on the United States by CERCLA do not include unlimited discretion to dictate settlement terms without meaningful judicial review. The court finds, however, that the increase in the amount to be paid by parties to the *De Minimis* PRP Consent Decree, when viewed in the context of the other settlements in this case and the goals of CERCLA, is not unfair or unreasonable.[24]

### c. "De Minimis" Characterization

■ Several of the non-settling defendants argue that EPA's definition of *de minimis*—those responsible for less than one percent of the volume of waste—is arbitrary and unfair. They contend that their liability under the *De Minimis* PRP Consent Decree is not *de minimis.* For example, even though it was responsible for less than one percent of the waste at the sites, Kingston–Warren states that it would have to pay $725,000 if it accepts the settlement. (Without the 100 percent penalty, the administrative settlement offer was approximately $390,000). Kingston–Warren suggests that this amount is more than what some of the non-*de minimis* parties may be assessed under the terms of the Major PRP Consent Decree.

Although the settlement offers to some of the *de minimis* defendants are for large amounts of money, it is not unreasonable for the plaintiffs to base the *de minimis* determination on a generator's share of the total amount of the waste at a site. The statute allows for *de minimis* settlements where:

such settlement involves only a minor portion of the response costs at the facility concerned and, in the judgment of the President, the conditions in either of the following subparagraph (A) or (B) are met:

(A) Both of the following are minimal in comparison to other hazardous substances at the facility:

(i) The amount of the hazardous substances contributed by that party to the facility.

(ii) The toxic or other hazardous effects of the substances contributed by that party to the facility.

(B) The potentially responsible party—

(i) is the owner of the real property on or in which the facility is located;

(ii) did not conduct or permit the generation, transportation, storage, treatment, or disposal of any hazardous substances at the facility and

(iii) did not contribute to the release or threat of release of a hazardous substance at the facility through any action or omission.

42 U.S.C. § 9622(g)(1). The definition of *"de minimis"* is left to the discretion of the President. 42 U.S.C. § 9622(g)(1).

EPA's definition of *"de minimis"* in this case is consistent with subsection (A), which bases the *de minimis* definition on a generator's proportional contribution to the

---

24. *Conservation Chemical,* on which non-settling defendant Kingston–Warren relies, does not alter this conclusion. In reviewing a preliminary agreement prior to the consent decree stage, the court in *Conservation Chemical* stated:

The Court will not tolerate either a "windfall" or a "wipe out" which results in an apportionment of responsibility which arbitrarily or unreasonably ignores the comparative fault of the parties, where there is a reasonable basis for allowing that comparison to be made. 628 F.Supp. at 402. The court in *Conservation Chemical* held that a settlement in accordance with the principles of the Uniform Comparative Fault Act ("UCFA") would be proper. Under the UCFA, when a plaintiff settles with less than all

of a group of joint tortfeasors, the liability of nonsettling defendants is reduced by the settling defendants' proportionate share of liability. However, this decision was rendered prior to the Superfund Amendments and Reauthorization Act of 1986, P.L. 99–499, § 101 *et seq.*, 100 Stat. 1613 (1986) ("SARA"). As discussed *infra,* SARA expressly rejected the UCFA approach in favor of the approach embodied in the Uniform Contribution Among Joint Tortfeasors Act ("UCATA"), which provides that in the event of a settlement with less than all jointly and severally liable defendants, the non-settling defendants' liability is reduced only by the amount of the settlement. *See* 42 U.S.C. § 9613(f)(2).

waste at a site. Such an application of the statute is not unreasonable in view of Congress's clear intention to have the government settle early with small generators in order to be able to simplify negotiations, focus on those with greater proportional responsibility, and speed the cleanup of Superfund sites. In addition, the United States has in this case represented that the parties eligible for *de minimis* treatment in CERCLA cases are often defined on the basis of volume and that one percent is a customary cut-off.

Although the $390,000 initially offered to Kingston–Warren and the $579,432 settlement offer to Olin Hunt are not nominal amounts of money, where, as here, the estimated cleanup costs exceed $58,000,000, these sums are proportionally small, each less than one percent of the total estimated cleanup cost. Moreover, as plaintiffs point out, several of the parties who joined the initial administrative settlements paid amounts that were either greater than, or in the same range as, the payments the objecting defendants would have been required to make if they accepted the *De Minimis* PRP Consent Decree.[25] Indeed, of the ten eligible parties who would have paid the largest amounts, seven joined the administrative settlement. Thus, in light of the statutory direction to define *de minimis* by "comparison to other hazardous substances at the facility" and the deference to be provided to the President in defining the term, this court does not find a one percent volumetric share standard in this case to be unreasonable or an abuse of discretion.

### d. Individual Complaints

Several of the non-settling defendants have asserted objections based on particular provisions that they believe are unfair to them individually. In view of the court's obligation to analyze the proposed settlements from the standpoint of all of the parties, none of these individual complaints

indicate the Consent Decrees should not be approved.

▪ Scott Brass argues that the Consent Decrees are unfair because they define a generator's proportionate share based solely on volume, rather than taking into account factors such as toxicity. The court recognizes that in several cases courts have noted that factors other than volumetric share may be considered. *See Conservation Chemical*, 628 F.Supp. at 401 (relative fault should be based on "factors such as volume, toxicity, migratory potential, etc."); *United States v. Chem–Dyne Corp.*, 572 F.Supp. 802, 811 (S.D.Ohio 1983) ("the volume of waste of a particular generator is not an accurate predictor of the risk associated with the waste because the toxicity or migratory potential of a particular hazardous substance generally varies independently with the volume of the waste ...").

However, the court does not find that the approach adopted by the plaintiffs and the Steering Committee representing the interests of all PRPs in this case was unreasonable or unfair. The allocation formula used in the initial administrative settlement and continued in the *De Minimis* PRP Consent Decree was developed through extensive negotiations between the plaintiffs and the Cannons Steering Committee, which represented both large and small generators, including Scott Brass. During the discussions, the Cannons Steering Committee did not endorse an allocation proposal which treated waste differently based on waste type. Thus, the PRPs collectively were involved in the development of the allocation procedure, and the responsibility of each is based on the same criterion—volume. While Scott Brass might have been required to pay less if different standards were agreed upon, some other party would have been called upon to pay more and could have asserted an objection like that now made by Scott Brass. Thus, the method used must be assessed as it applies to the group as a whole. In this case, it

---

**25.** For example, as part of the administrative settlement Allen Manufacturing Company paid $599,975, Hermitite Corporation paid $559,712, Aerovox Industries, Inc., paid $546,791, General

Printing Ink Company paid $487,805, J.M. Huber Corporation paid $457,515, Uniroyal, Inc. paid $439,741, and General Motors paid $393,344.

passes that test because relying on volume is in this case a reasonable method to calculate appropriate contributions for settlement purposes.

As the plaintiffs note, determining the precise percentage of hazardous substances in the waste sent by each of the more than 350 generators would have required extensive discovery and analysis. It would also probably have led to intense disputes among the generators as to how the wastes of each party should be treated. These factors would undoubtedly have delayed significantly possible settlements. Thus, it was reasonable for the plaintiffs and the PRPs to want to avoid such a protracted and expensive process.

The large number of PRPs who have accepted settlements based on volumetric share suggests that such an approach is fair under the circumstances. If Scott Brass is convinced that the waste it arranged to be transported to the sites was largely innocuous, it may continue to make that argument and, if warranted, move for summary judgment. However, this issue is not sufficient to render unfair settlements endorsed by 59 other PRPs.

Cyn Oil objects to EPA's "transshipment formula," which has resulted in it being liable for remedial costs at the Londonderry, Plymouth and Nashua sites when it arranged for delivery only to the Bridgewater site.

■■■■ Generators may be held liable under CERCLA for the ultimate destination of their waste, regardless of whether they had intended their waste to be sent there. *United States v. Bliss*, 667 F.Supp. 1298, 1310 (E.D.Mo.1987); *Violet v. Picillo*, 648 F.Supp. 1283, 1291–92 (D.R.I.1986); *United States v. Conservation Chemical Co.*, 619 F.Supp. 162, 234 (W.D.Mo.1985); *Missouri v. Independent Petrochemical Corp.*, 610 F.Supp. 4, 5 (E.D.Mo.1985); *United States v. Wade*, 577 F.Supp. 1326, 1333 n. 3 (E.D.Pa.1983). In this case,

waste was shipped from the Bridgewater site to the other three facilities. Therefore, the transshipment formula used in this case is consistent with CERCLA and is not unfair.

Cyn Oil also argues that its volumetric share should have been reduced by the "petroleum exemption" in 42 U.S.C. § 9601(14),[26] because it provided quantities of waste oil to these sites.

As with Scott Brass's toxicity claim, resolution of this argument in the settlement context would have necessitated discovery, analysis and delay.[27] Cyn Oil may continue to make this argument during this litigation, but it does not provide a reason for not approving the Consent Decrees.

■■■■ Finally, Crown Roll argues that the Consent Decrees extract a double penalty from Crown Roll. A district court in New Jersey has granted summary judgment for the EPA in an action charging Crown Roll with violations of 42 U.S.C. § 9604(e), the CERCLA provision that requires PRPs to disclose information to EPA. *United States v. Crown Roll Leaf, Inc.*, slip op., no. 88–831 (D.N.J. Oct. 20, 1988) (unpublished). That court held that Crown Roll acted in bad faith in failing to respond to a request from EPA and assessed a penalty of $142,000. *United States v. Crown Roll Leaf, Inc.*, slip op., no. 88–831 (D.N.J. April 28, 1989). The New Jersey action relates to the same four sites, and Crown Roll argues that all matters pertaining to it should be decided by the New Jersey court.

Subsection (5)(B) of 42 U.S.C. § 9604(e) authorizes injunctive relief and a civil penalty of up to $25,000 per day of noncompliance with CERCLA information request provisions. These provisions and penalties are separate from the governments' authority to seek reimbursement and remediation under the other sections of the law. It would be obviously unfair to allow the effects of Crown Roll's misconduct to de-

---

**26.** 42 U.S.C. § 9601(14) exempts petroleum products from the definition of "hazardous substance" under CERCLA unless designated as such by one of several other federal environmental laws.

**27.** Plaintiffs indicate that several of the settling defendants also delivered petroleum products to the sites.

feat approval of the Consent Decrees agreed to by numerous other parties.[28]

Accordingly, the court finds that both proposed Consent Decrees are legal, reasonable, and fair when viewed in light of the interests of all of the parties. Moreover, they serve the public interest in the prompt cleanup of hazardous waste sites and in requiring responsible parties to bear the costs of remediation.

### III. *Motions to Dismiss Cross–Claims & To Amend Answers to Add Cross–Claims*

Many of the 47 defendants who joined the Major PRP Consent Decree and defendant Giusti Baking Company of New Bedford, who joined the *De Minimis* PRP Consent Decree, have filed Motions to Dismiss the Cross–Claims of Non–Settling Defendants for contribution, indemnification, negligence, breach of contract, and injunctive relief. The Cannons Sites Group, consisting of 26 settling defendants, together with other settling defendants, have also filed oppositions to the Motions to Amend Answers to Assert Cross–Claims brought by Beggs & Cobb, Inc. and Raymark Industries, Inc., and have moved in the alternative to dismiss those cross-claims. These motions raise issues regarding CERCLA's contribution protection provisions. *See* 42 U.S.C. § 9613(f)(2). For the reasons stated below, the foregoing motions are meritorious and will be allowed.

#### A. *Standard of Review*

Cross-claims may be dismissed only if it "appears beyond doubt that the [claimant] can prove no set of facts in support of [his] claim which would entitle [him] to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). For the purposes of a motion to dismiss for failure to state a claim, the material allegations of the cross-claim are to be taken as true. *Jenkins v. McKeithen,* 395 U.S. 411, 421, 89 S.Ct. 1843, 1848, 23 L.Ed.2d 404, *reh'g denied,* 396 U.S. 869, 90 S.Ct. 35, 24 L.Ed.2d 123 (1969); *O'Brien v. DiGrazia,*

544 F.2d 543, 545 (1st Cir.1976), *cert. denied,* 431 U.S. 914, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977).

#### B. *Contribution*

Both of the proposed Consent Decrees in this case refer to Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), and provide that settling defendants are protected from contribution claims by non-settling defendants. First Partial Consent Decree ¶ 27; Second Partial Consent Decree ¶ 7. The settling defendants point out that they have agreed to the Consent Decrees and that CERCLA provides as matter of law that parties to a "judicially approved" settlement are immune from contribution claims by non-settling parties. Thus, they argue, if the court approves the Consent Decrees, the cross-claims for contribution must be dismissed.

The cross-claimants' initial argument against dismissal is based on their opposition to the Motions for Entry of Two Partial Consent Decrees as final Judgments. They argue that because the Major PRP Consent Decree should not be approved, the contribution protection provisions should not go into effect, and their cross-claims against the settling major PRPs should not be dismissed. Because the court has decided to approve the Consent Decrees, this argument is moot. However, two of the non-settling defendants assert statutory and constitutional grounds as to why the Major PRP Consent Decree should not be approved, or why the contribution protection provisions of both Consent Decrees should not be given effect.

#### 1. *Uniform Comparative Fault Act*

■ Scott Brass argues that providing contribution protection to the major PRPs is unfair because it fails to account for the relative fault of the parties. Scott Brass contends that the Consent Decrees should employ the principles of the Uniform Comparative Fault Act (UCFA). Under the UCFA, when a plaintiff settles with less than all of a group of joint tortfeasors, the

---

**28.** Crown Roll is not eligible to participate in any settlement at this stage because it has not complied with the information production requirements of CERCLA.

liability of non-settling defendants is reduced by the settling defendants' proportionate share of liability, rather than by the amount paid by the settling defendants.

However, § 113(f)(2) of CERCLA, as amended by SARA in 1986, states:

Settlement. A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially liable persons unless its terms so provide, but it *reduces the potential liability of the others by the amount of the settlement.*

42 U.S.C. § 9613(f)(2) (emphasis added). Scott Brass seems to argue that in negotiating these Consent Decrees plaintiff should have ignored this statutory provision and provided a mechanism, such as that suggested by UCFA, by which non-settling defendants would be protected from paying a disproportionate share of the cleanup costs.

Scott Brass's argument is, however, inconsistent with the plain terms of section 113(f)(2). As originally enacted in 1980, CERCLA did not expressly provide for a right of contribution among parties found jointly and severally liable to the United States or a State. However, in construing the 1980 statute, several courts found an implied right of contribution among jointly and severally liable parties. *United States v. New Castle County*, 642 F.Supp. 1258 (D.Del.1986); *Colorado v. ASARCO, Inc.*, 608 F.Supp. 1484 (D.Colo.1985); *United States v. A & F Materials Co.*, 578 F.Supp. 1249, 1256–57 (S.D.Ill.1984); *but see United States v. Westinghouse Electric Corp.*, 14 Env't L.Rep. 20483 (S.D.Ind. June 29, 1983) (finding no right of contribution).

In amending CERCLA in 1986, Congress added section 113(f)(1), 42 U.S.C. § 9613(f)(1), creating an express right of contribution among parties found liable to the United States or a State. Congress simultaneously added section 113(f)(2), which provides that contribution actions cannot be maintained against parties who have settled their liability to the United States or a State for the matters covered by the settlement. 42 U.S.C. § 9613(f)(2). Section 113(f)(2) expressly states that in the event of a settlement the joint and several liability of non-settling defendants is reduced "by the amount of the settlement."

This language indicates that Congress made a conscious choice in 1986 not to adopt UCFA principles for CERCLA purposes. Rather, Congress adopted the approach taken in section 4 of the Uniform Contribution Among Tortfeasors Act (1955 Revision) ("UCATA"), which provides:

When a release or a covenant not to sue or not to enforce judgment is given in good faith to one or two or more persons liable in tort for the same injury or the same wrongful death:

(a) It does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide; *but it reduces the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is greater;* and

(b) It discharges the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor. (Emphasis added).

In their comments on the UCATA, the Commissioners on Uniform State Laws stated that section 4 has the purpose and effect of encouraging settlements by providing protection to early settlers and subjecting non-settlers to paying the plaintiffs' unrecovered costs. Congress, in enacting section 113(f)(2) of CERCLA, had the same goal of encouraging settlements. *See City of New York*, 697 F.Supp. at 681 & n. 5 (S.D.N.Y.1988) (section 113(f)(2) does not follow UCFA; "if settling defendants have paid *less* than their proportionate share of liability, section 113(f)(2) apparently compels non-settlers to absorb the shortfall"). *United States v. Pepper's Steel and Alloys, Inc.*, 658 F.Supp. 1160, 1168 (S.D.Fla. 1987) (approving a consent decree which

expressly incorporated section 4 of the UCATA).[29]

The cases to the contrary relied upon by Scott Brass are clearly distinguishable. For example, the 1985 decision in *Conservation Chemical Co.*, 628 F.Supp. at 402, which suggested the application of UCFA principles to CERCLA settlements, was rendered before Congress adopted section 113(f)(2) in 1986, and thus did not construe that now controlling section. Scott Brass also cites *Edward Hines Lumber Co. v. Vulcan Materials Co.*, No. 85-C-1141, 1987 WL 27368 (N.D.Ill. Dec. 4, 1987), *aff'd on other grounds*, 861 F.2d 155 (7th Cir. 1988), where the court applied UCFA principles to a CERCLA settlement among private parties, which did not involve the government. The *Hines* court specifically emphasized that it was adopting a rule applicable to "a settlement among non-governmental parties." Slip op. at 5. Similarly, the decision in *Lyncott Corp. v. Chemical Waste Management*, 690 F.Supp. 1409, 1418 (E.D.Pa.1988), is inapposite because the case did not involve a governmental plaintiff or section 113(f)(2).

Therefore, Scott Brass' complaint concerning the propriety of reducing the exposure of the non-settling defendants only by the amount paid by the settling defendants is without merit.

#### 2. *Constitutional Objections*

Olin Hunt argues that the contribution protection provisions of CERCLA violate the due process and equal protection clauses of the United States Constitution. With regard to due process, Olin Hunt asserts it has a property interest in—a legitimate claim of entitlement to—the funds it would have to pay under the *De Minimis* PRP Consent Decree and that due to arbitrary, capricious and irrational government action Olin Hunt and other *de minimis* generators are being forced to bear a disproportionate share of the cleanup costs.

Olin Hunt's equal protection argument is apparently as follows. Although Olin Hunt's volumetric share of damages, calculated without the 60 percent premium or the 100 percent penalty, is approximately $370,000, it may have to pay as much as $2 million because it and the other non-settling defendants may be liable for the estimated $10 million in unaccounted for costs after the Consent Decrees are entered.[30] Olin Hunt argues that if it is unable to cross-claim against the settling defendants, it may have to pay more than five times the amount of actual damages EPA attributes to it.[31] Olin Hunt asserts that this in-

---

**29.** The United States argues that the primary thrust of UCFA as proposed in 1977 was to provide a uniform act for States that wished to substitute principles of comparative fault for the traditionally absolute defense of contributory negligence. The Prefatory Note to the UCFA makes clear that the Commissioners were not proposing the UCFA as an improvement over the UCATA, but rather as an alternative. The Commissioners noted that they had "decided not to amend the separate Uniform Contribution Among Tortfeasors Act, 1955, but to leave that Act for possible use by states not adopting the principle of comparative fault." Considering the Commissioners' Comments, application of the UCFA to CERCLA cases is highly inappropriate, because CERCLA liability is not based on negligence or comparative fault, but is based on strict liability to the government. *See United States v. Monsanto, Co.*, 858 F.2d 160, 168–68 (4th Cir.1988); *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1049 (2d Cir.1985); *Violet v. Picillo*, 648 F.Supp. 1283, 1290 (D.R.I.1986).

**30.** Olin Hunt's volumetric share comprises 20 percent of the total volumetric share of the remaining non-settling defendants.

**31.** At a hearing on plaintiffs' Motion for Entry of the Two Partial Consent Decrees as Final Judgments, counsel for the United States conceded that at present estimates, non-settling defendants could be liable for as much as four times their volumetric share. However, counsel for the plaintiffs and for some of the major PRPs pointed out that the amount of the non-settling defendants' liability will depend on several factors. The plaintiffs could seek to hold the non-settling defendants liable for the approximately $4 million in past costs that remain unrecovered after approval of the two Consent Decrees. But beyond that, the non-settling defendants' liability will depend on how much actual costs exceed current estimates of the expected value of the work and at which sites such excesses occur. For example, signatories to the Major PRP Consent Decree are liable for unexpectedly higher costs at the Bridgewater site, but the are not liable for higher costs at the Nashua site unless the United States and New Hampshire spend more than $19 million at that site after January 1, 1988. The government could seek unrecovered amounts less than $19 million from the nonsettling defendants.

creased exposure is arbitrary, unjust and irrational because it is not based on new evidence that Olin Hunt had increased responsibility for conditions at the sites. Rather, it results from EPA's allegedly unbalanced settlement tactics.

Olin Hunt argues that a more rational approach for Congress would have been to adopt the comparative fault approach for CERCLA embodied in the UCFA. Olin Hunt asserts that the UCFA approach, under which non-settling jointly and severally liable defendants are released by their proportionate share of liability rather than by the amount received from settlers, would be more equitable and, therefore, constitutional.

With respect to Olin Hunt's due process argument, in two recent cases the Supreme Court has ruled that a right of contribution from a joint tortfeasor does not exist as a matter of federal common law. *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 638, 101 S.Ct. 2061, 2065, 68 L.Ed.2d 500 (1981); *Northwest Airlines, Inc. v. Transport Workers Union, AFL–CIO*, 451 U.S. 77, 90, 101 S.Ct. 1571, 1580, 67 L.Ed.2d 750 (1981). Instead, a right of contribution exists only if Congress intended to create such a right in a particular statute, or if the courts determine that it is appropriate to fashion one to implement a federal statute. *Id.* In *Texas Industries,* the Supreme Court held that there was no statutory basis for allowing a tortfeasor to seek contribution from a joint tortfeasor under the Sherman and Clayton Acts. 451 U.S. at 639–40, 101 S.Ct. at 2066–67. The Court reached a similar conclusion in *Northwest Airlines* regarding the Equal Pay Act and Title VII of the Civil Rights Act. 451 U.S. at 84 n. 50, 101 S.Ct. at 15 n. 50. In each case, the Court held that it was inappropriate for the courts to fashion a right of contribution as a matter of federal common law in applying these statutes. *Texas Industries,* 451 U.S. at 639–40, 101 S.Ct. at 2066–67; *Northwest Airlines,* 451 U.S. at 98, 101 S.Ct. at 1584.

Similarly, it appears there is no common law federal right to contribution in a CERCLA case. Rather, 42 U.S.C. § 9613(f)(1) both established and defined, rather than removed, the right of a joint tortfeasor to contribution in CERCLA cases.

■ Moreover, even if the non-settling defendants would have otherwise had a pre-existing right to contribution, enactment of 42 U.S.C. § 9613(f)(1), which provides contribution protection to settling defendants, was not an unconstitutional taking or a violation of any right to due process because Congress has the power to create new rights or limit existing ones if, as here, it has a valid legislative purpose. *See Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 88 n. 32, 98 S.Ct. 2620, 2638 n. 32, 57 L.Ed.2d 595 (1978) (upholding Price–Anderson Act's limitations on state tort claims in event of nuclear plant accident). *See also Hammond v. United States*, 786 F.2d 8, 12 (1st Cir.1986) ("No person has a vested interest in any rule of law entitling him to insist that it shall remain unchanged.").

With respect to Olin Hunt's equal protection claim, because CERCLA is social and economic legislation, and generators of hazardous waste are not a suspect class, the policy choices embodied in the law are invalid only if there is no rational basis to support them. *See Vance v. Bradley*, 440 U.S. 93, 97, 99 S.Ct. 939, 942, 59 L.Ed.2d 171 (1979). The utilization of the UCATA approach in CERCLA was not irrational because these provisions encourage early settlements and limit the use of public funds for site cleanup. *See Dedham Water Co. v. Cumberland Farms Dairy*, 805 F.2d 1074, 1081 (1st Cir.1986) (Superfund had limited resources and Congress intended responsible parties to bear costs of remediation).

Thus, there is no constitutional impediment to effectuating the express provisions of 42 U.S.C. § 9613(f)(2). *Cf. Conservation Chemical*, 619 F.Supp. at 221 (upholding constitutionality of CERCLA as a whole). Accordingly, the Motions to Dismiss the Cross–Claims of Non–Settling Defendants seeking contribution must be allowed and the Motions to Amend Answers to Add Cross–Claims for contribution must

be denied because adding such claims would be futile. *See Vargas v. McNamara*, 608 F.2d 15, 18 (1st Cir.1979) (futility "valid reason for denying a motion to amend").

### 2. *Indemnification*

■ The settling defendants argue that the non-settling defendants' cross-claims seeking indemnification should be dismissed because the non-settling defendants have not alleged an express or implied contractual right or any sort of special relationship creating a right to indemnification. The plaintiffs have not taken a position on the dismissal of the indemnity claims.

The doctrines of indemnity and contribution are related, but distinct.

> Contribution is the method by which a tortfeasor sues a joint tortfeasor for its share of a joint liability to an injured plaintiff. Indemnity is the device by which a tortfeasor "passes through" his entire liability to a third party whom the tortfeasor alleges is the real party responsible for the injury.

*Milai v. Tradewind Industries, Inc.*, 556 F.Supp. 36, 37 (E.D.Mich.1982). Generally, indemnification is based on the existence of a contract or a special relationship between the parties. However, some courts have applied the doctrine to other situations. In such cases:

> The unexpressed premise has been that indemnity should be granted in any factual situation in which, as between the parties themselves, it is just and fair that the indemnitor should bear the total responsibility, rather than to leave it on the indemnitee or to divide it proportionately between the parties by contribution.

*Restatement (Second) of Torts* § 886B comment c (1979). *See Morrissette v. Sears, Roebuck & Company*, 114 N.H. 384, 322 A.2d 7, 9 (1974) ("right to indemnity arises where one is legally required to pay an obligation for which another is primarily liable"); *Fireside Motors v. Nissan Motor Corp.*, 395 Mass. 366, 370, 479 N.E.2d 1386 (Mass.1985) (cause of action for indemnity exists "independently of statute, and whether or not contractual relations exist between the parties.").

Olin Hunt and Scott Brass argue that equitable indemnity should be imposed in this case because they generated a small amount of the waste at issue and, therefore, their fault is comparatively minor. They argue that precluding indemnification claims would be inconsistent with the intention of Congress that CERCLA not be interpreted so as to affect small generators unfairly.

However, the parties in this case engaged in commercial relations pursuant to various contracts, none of which contained an indemnification provision. The court concludes that if any of the parties intended to be protected by indemnification, they should have negotiated mutually acceptable indemnification provisions and included them in their contracts.

In the context of CERCLA, equitable indemnity should not be imposed for additional reasons. First, indemnification acts to relieve a party of liability where a third party is the real party responsible for the injury. *Milai*, 556 F.Supp. at 37. CERCLA imposes strict joint and several liability on generators. Therefore, *de minimis* generators such as Olin Hunt and Scott Brass may be liable for remediation costs, even if they were not negligent. The only relevant question in determining liability is whether the defendants generated any of the wastes that were deposited at the sites. None of the cross-claiming defendants argue that they did not arrange for waste delivery to at least one of the sites. Thus, in the context of CERCLA, there is no equitable reason to recognize defendants' equitable indemnification claims.

Most importantly, however, implying an equitable right to indemnity in this case would utterly undermine the contribution protection provisions of CERCLA. CERCLA is silent on the indemnity issue. In the absence of any provision expressly addressing indemnity, the court must construe the statute "liberally to avoid frustration of the beneficial legislative purposes." *Dedham Water*, 805 F.2d at 1081. As indicated earlier, the contribution protection provisions serve the important function of encouraging early settlements. Failure to

provide similar protection against suits for equitable indemnity would encourage defendants to re-cast their contribution claims as indemnity claims and injure, if not destroy, the goals to be served by the express contribution protection provisions of CERCLA. This obviously would be inappropriate.

Accordingly, the non-settling defendants cannot maintain claims for indemnity against any of the settling defendants. Thus, defendants' Motions to Dismiss the Cross–Claims for indemnity will be allowed.

### 3. Negligence and Breach of Contract

Crown Roll has brought claims of negligence and breach of contract against several of the settling defendants.[32] As the settling defendants point out, the only damage alleged by Crown Roll is its potential liability to the plaintiffs. Therefore, Crown Roll's claims are simply claims for indemnification or contribution and must be dismissed.

### 4. Injunctive Relief

Crown Roll has also brought a cross-claim for mandatory injunctive relief directing the cleanup of the sites.

■ Section 106(a) of CERCLA, 42 U.S.C. § 9606, provides the President with the authority to seek injunctive relief where EPA "determines that there may be imminent and substantial endangerment to the public health or welfare or the environment." Under CERCLA, injunctive relief is available only to the United States. See State of New York v. Shore Realty Corp., 759 F.2d 1032, 1049 (2d Cir.1985) ("we ... are required to hold that injunctive relief under CERCLA is not available to the State"). Similarly, no private right to injunctive relief is available under the relevant state statutes. Section 11 of Chapter 21E of the Massachusetts General Laws states that only the Commonwealth can obtain an injunction "upon the petition of the Attorney General or Commissioner [of the Department of Environmental Quality Engineering]." The same is true under New Hampshire law. See N.H.Rev.Stat. Ann. § 147–A:9(II) (1988 supp.) ("The attorney general may bring an action to recover costs of containment, cleanup, or removal incurred by the division of waste management, the state, or both. This action may be brought in connection with an action for injunctive relief ...").[33]

### IV. Entry as Final Judgments

■ Because the Consent Decrees do not resolve the claims against all defendants, plaintiffs move under Rule 54(b) of the Federal Rules of Civil Procedure to have the two Partial Consent Decrees entered as final judgments on the claims against the 59 settling defendants. Rule 54(b) provides in relevant part:

When more than one claim for relief is presented in an action ... or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon the express direction for the entry of judgment.

In ruling on a motion under Rule 54(b), a court is to take into account the interests of judicial administration and the equities of the case. Curtiss Wright Corp. v. General Electric Corp., 446 U.S. 1, 8, 100 S.Ct. 1460, 1464, 64 L.Ed.2d 1 (1980); C.R. Bard, Inc. v. Medical Electronics Corp., 529 F.Supp. 1382, 1388 (D.Mass.1982).

■ A recent First Circuit case has elaborated the standards for entry of a final judgment pursuant to Rule 54. Consolidated Rail Corp. v. Fore River Ry. Co., 861 F.2d 322 (1st Cir.1988). According to Consolidated Rail, Rule 54(b) imposes a three step test for entry of a final judgment. First, a court must determine that it

---

32. Crown Roll has filed such claims against the Tinkham defendants, the Cannons Sites Group, and "Certain Settling Defendants," which is made up of several individuals and small companies.

33. In addition, the court notes that if the Consent Decrees are approved an injunction would, in any event, be inappropriate because there is no imminent threat of irreparable harm. Rather, the Consent Decrees provide for the prompt cleanup of the sites.

is dealing with a final judgment for purposes of 28 U.S.C. § 1291. *Id.* at 325. Second, a court must determine in its discretion that there is no just reason for delay, such as the risk of piecemeal review. *Id.* Finally, a court is required to "specifically enumerate all of the factors and concerns relied upon when reaching its decision." *Id.* Other than their general opposition to the court's approval of the Consent Decrees, the non-settling defendants have raised no objection to the decrees being entered as final judgments.

The *Consolidated Rail* standard is met in this case. First, these Consent Decrees constitute "judgments" because they resolve all liability of the settling defendnats on "cognizable claim[s] for relief" brought by plaintiffs under CERCLA. *Curtiss-Wright,* 446 U.S. at 7, 100 S.Ct. at 1464. The judgment is "final" because the Consent Decrees constitute "an ultimate disposition of an individual claim entered in the course of a multiple claims action." *Sears, Roebuck & Co. v. Mackey,* 351 U.S. 427, 436, 76 S.Ct. 895, 90, 100 L.Ed. 1297 (1956). With the approval of the Consent Decrees, the claims against the settling defendants are completely resolved.

██ Moreover, in view of the complexity of this litigation, the public interest in prompt cleanup, and the statutory goal of providing finality to settling defendants, the court finds that there is no just reason to delay the entry of final judgment. The settling defendants who have negotiated a settlement of their claims in good faith should not have to wait until the resolution of plaintiffs' claims against non-settling defendants to learn whether the settlements are final, particularly because CERCLA expressly authorizes the United States to enter into settlements which do not involve all potential defendants. *See* 42 U.S.C. § 9622. The settling defendants are, under the Consent Decrees, obligated to make payments and/or perform work. They are entitled to know if they will obtain the benefit of their bargains before incurring these substantial costs.

## V. Order

In view of the foregoing, it is hereby ordered that:

1. Plaintiffs' Motions for Approval of the Two Partial Consent Decrees are ALLOWED;

2. The First and Second Partial Consent Decrees are hereby entered as final judgments;

3. The Motions to Dismiss the Cross-Claims of Non-Settling Defendants are ALLOWED;

4. The Motions to Amend Answers to Add Cross-Claims brought by non-settling defendants are DENIED.